JUDGE SCHOFIELD

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MASHREQBANK, PSC,

                                    Plaintiff,

        -against-

ING GROEP N.V., ING INVESTMENT
MANAGEMENT COMPANY a/k/a ING
INVESTMENT MANAGEMENT U.S., ING
MANAGED ACCOUNT GROUP or ING
INVESTMENT MANAGEMENT AMERICAS,
RICHARD KILBRIDE, and DOES 1-10 inclusive,

                                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**13 CV 2318**

Civ. No.

**COMPLAINT**

**JURY DEMAND**

ECF CASE

RECEIVED
APR 08 2013
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff MashreqBank, psc ("Mashreq"), by and through its undersigned counsel, brings this action against defendants ING Groep N.V. ("ING Groep") and its indirect wholly owned subsidiary ING Investment Management Company a/k/a ING Investment Management U.S., ING Managed Account Group or ING Investment Management Americas ("IIM") (all together, "ING"); and Richard Kilbride (collectively, "defendants"). Mashreq's relationship with ING began in 2005 when it entered into an Investment Management Agreement for Discretionary Accounts with IIM ("IMA"). Under the IMA, IIM had complete discretion and authority to manage Mashreq's Intermediate Fixed Income Separately Managed Account ("ING Intermediate Fixed Income Account") subject to the Investment Guidelines incorporated into the IMA, together with the IMA known as "Original Investment Mandate" (attached hereto as Exhibit 1). On February 5, 2007, the parties replaced the IMA and the Original Investment Mandate with a revised mandate ("Revised 2007 Mandate") (attached hereto as Exhibit 2)(collectively, the "Mandates"). By 2007, Mashreq had $108 million under ING's management. Mashreq, based on personal knowledge as to itself and its own conduct, and on information and belief as to all other matters, alleges as follows:

## INTRODUCTION

1.      In late 2006, ING tried to convince the owners of various ING Intermediate Fixed Income Separately Managed Accounts to approve revised mandates that would allow ING to invest in a much broader range of securities. ING had built into its investment advisory agreements with its clients the unusual right to use its own broker affiliates to trade securities for investment advisory clients. Thus a mandate change of this type would mean churning and a raft of fresh commission income and other fees for ING.

2.      ING targeted Mashreq — which had maintained an ING Intermediate Fixed Income Separately Managed Account with ING since 2005 — with such a presentation in a New York meeting in November 2006. At the end of the presentation, ING made several specific

proposals to change the Original Investment Mandate's "anachronistic guidelines [that] limit breadth."

3.     At the meeting, Mashreq accepted a few of the more minor changes proposed by ING, while emphatically rejecting others. Specifically, Mashreq emphatically rejected and crossed out ING's key proposal: "***Expressly allow CDOs, CBOs, CLOs, and other structured products***."

4.     Over the next two months, ING and Mashreq exchanged drafts of a revised mandate, culminating in their execution of the Revised 2007 Mandate on February 5, 2007. The Revised 2007 Mandate memorialized what Mashreq had communicated at the November meeting: rather than "[e]xpressly allow CDOs, CBOs and CLOs," the Revised 2007 Mandate prohibited them because that is what Mashreq insisted. Had the Revised 2007 Mandate instead expressly allowed CDOs, etc., Mashreq would have pulled its account from ING, which it had the right to do at any time under the IMA.

5.     But it is also now clear that, as far as ING was concerned, the Revised 2007 Mandate was nothing more than trickery designed to convince Mashreq to keep its money with ING. ING never intended to abide by the Revised 2007 Mandate. Instead its sole purpose, from ING's perspective, was to induce Mashreq — through misrepresentations and omissions — into leaving $108 million in ING's care. Indeed, forensic analysis of the account has subsequently revealed that between February and July 2007, ING proceeded to pack Mashreq's account 70% full of 11 toxic, illiquid "structured securities" based on pools of loans cast off by investment banks, securities that Mashreq had emphatically instructed ING not to include in the portfolio and securities that blatantly violated the Mandates for the portfolio in at least seven ways.

6.     Knowing that Mashreq did not want them, ING hid these 11 securities — which had innocuous, respectable-sounding names (Madison Park, Fraser Sullivan, Liberty Harbour, and

Commercial Industrial Finance) — from Mashreq by intermixing them with conventional bonds in some reports and miscategorizing them in others. That is, to the extent that the toxic securities were broken out as a category, they were misleadingly categorized as ABS or asset-backed securities, which implied that they were backed by consumer loans such as home equity loans, car loans or credit-card receivables. Meanwhile, defendants were well-aware that it would be nearly impossible for Mashreq to do its own research about the securities since they were private, confidential and unregistered by their very terms. When Mashreq repeatedly requested ING's due diligence, valuation models and other internal research underlying its purchases, ING refused to respond and, to date, have never provided this information to Mashreq.

7.      Meanwhile, from a portfolio management perspective, it is difficult adequately to express the extremity of ING's investment conduct. Securities of this type were not permitted in the account and 70% of the account was invested in precisely such securities. By comparison, the most analogous securities that *were* permitted under the Revised 2007 Mandate, A-rated mortgage-backed securities, had a total exposure limit of 15%. That is, even if the securities had been permitted, the account's 70% concentration in those securities was outrageous, particularly for a conservative investment-grade intermediate bond account.

8.      Moreover this 70% concentration was in securities that were — even on an individual basis — extremely risky, toxic and illiquid. To wit, Mashreq has — after diligent and rigorous research — been able to elicit the following characteristics that the toxic securities comprising 70% of the portfolio shared in common:

- The securities were not registered with the Securities and Exchange Commission ("SEC").
- No independent auditor was appointed or named.
- Offering Circulars and Prospectuses for the securities were not publicly available.
- That the securities were unmarketable was disclosed in the Offering Circulars.

- Securities were illiquid — maturities were locked up for more than 10 years; and for 28, 33 or 40 years for some of them.
- Collateral underlying the securities was not specifically identified.
- Collateral was below investment grade.
- Issuers were shell corporations without separate assets or operations.

9.     Defendants' investment conduct was so extreme that the process of carefully perfecting the Revised 2007 Mandate just a few months earlier **must** have been — from ING's perspective — a complete charade. It **was** a complete fraud. There is simply no other way to reconcile ING's detailed communications with Mashreq between November 2006 and February 2007, on the one hand, and their egregiously reckless and extreme investment conduct between February and July 2007, on the other.

10.     Mashreq and ING had a fiduciary relationship and Mashreq was relying on ING's unique and special expertise in the Intermediate Fixed Income Accounts management to provide Mashreq investment advice and invest its funds in a reasonable and prudent manner consistent with the objectives identified and communicated to ING. The parties had created a relationship of higher trust and Mashreq was reasonably relying on this trust. Defendants breached this fiduciary relationship by making investments that violated the Mandates and the stated intention of their client and it was this breach that directly caused Mashreq to suffer damages.

11.     ING's investments in the 11 securities also affirmatively violated the Revised 2007 Mandate — **and the Revised 2007 Mandate thus affirmatively misrepresented ING's intended investment conduct** — in at least seven ways, by *inter alia*:

(i)     failing to invest Mashreq's funds in securities that met the letter and spirit of guideline 2 on "Credit Quality" requiring that all portfolio securities be investment grade and liquid;

(ii)     violating guideline 4, "Permitted Securities" by purchasing CDOs, CLOs, and CBOs which are nowhere mentioned in the long list of permitted securities;

(iii)    violating guideline 5, "Prohibited Investments" by purchasing the 11 toxic illiquid securities that were expressly prohibited under "subordinated bank debt" as detailed below;

(iv)    violating the "Exposure Limits" established in guideline 6, since the 70% position in CDOs/CLOs exceeded the exposure limit established for each and every type of permitted security; the Revised 2007 Mandate does not include an exposure limit for CDOs/CLOs because they were not permitted securities;

(v)    failing to meet — by over 4,000 basis points — the agreed "Performance Benchmark" of three-month LIBOR plus 0.50% established in guideline 7;

(vi)    violating the monitoring and notification responsibilities set out in guideline 8, "Value at Risk," which required ING to monitor portfolio volatility and provide daily VaR on a monthly basis or notify Mashreq in the event that the daily marked to market valuation declined by more than 1%. Since the portfolio experienced losses of up to 50% during the relevant period, defendants had a duty to notify Mashreq that the portfolio had experienced a decline of more than 1%, but failed to do so; and

(vii)    failing to undertake any hedging, shorting or other risk-minimization strategies, identified in guidelines 9 through 12, leaving Mashreq fully exposed to the tremendous risks created by defendants' remaining wholesale violations of the Revised 2007 Mandate.

12.    The conclusion that defendants breached their fiduciary duties and intentionally engaged in fraud or reckless conduct becomes even more unavoidable when one examines ING's conduct as Mashreq began to slowly discover defendants' misconduct. When Mashreq began to discover the true nature of the securities defendants purchased in its account, Mashreq challenged defendants on their purchases as being directly contrary to its stated wishes and the Revised 2007 Mandate. Defendants lied and knowingly provided Mashreq with false assurances that the investments made on Mashreq's behalf were "money good" even though defendants could not possibly have had any knowledge of the contents or prospects of the blind pools according to their very terms. Instead defendants' statements and conduct were designed to prolong Mashreq's justifiable reliance on ING and prevent Mashreq from discovering the extremely risky and toxic

nature of the securities in question — and from discovering defendants' own even more egregious conduct in placing a whopping 70% of the account into such securities.

13.     Another facet of defendants' response was also typical of someone who had engaged in wrongdoing —they were initially defensive but then made a seemingly conciliatory gesture that was in reality just another trick. To wit, they proposed that Mashreq grant them a sweeping release in return for their agreement to repurchase two of the eleven unsellable securities for pennies on the dollar at then-current market prices — prices that were necessarily approximate due to tremendous illiquidity. In other words, defendants in a sense tried to use the very fact that Mashreq was now "stuck" in these completely illiquid positions as a means of extorting it into signing a release. Had Mashreq been in great financial difficulty, it may well have had no choice but to sign the release in return for achieving escape from just two of the eleven roach motels into which ING had placed them. But Mashreq refused this offer and was able to somewhat mitigate its initial damages of $60 to $70 million. It is these final mitigated damages of over $43 million (plus interest, consequential damages, attorneys' fees and other expenses) that Mashreq seeks in this action.

14.     None of these losses would have occurred but-for defendants' misrepresentations and omissions and Mashreq's reasonable reliance on those material misrepresentations and omissions. For example, had the Revised 2007 Mandate reflected the CDOs, CLOs, CBOs, etc., investments that ING intended to make with Mashreq's money, Mashreq would not have entered into the Revised 2007 Mandate, would have terminated the relationship with ING and withdrawn its money immediately as permitted under the IMA. Instead, ING filled the Revised 2007 Mandate with misrepresentations and omissions, knowing full well that the Revised 2007 Mandate bore no resemblance to how ING intended to manage Mashreq's account, but also knowing that these misrepresentations were the only way to lull Mashreq into keeping its money in ING's care.

## PARTIES

15.     Plaintiff Mashreq has its principal place of business in the United Arab Emirates and provides banking and financial services to millions of individuals and businesses.

16.     Defendant ING Groep is a publicly listed company based in The Netherlands. ING Groep is the parent of IIM.

17.     Defendant IIM is a United States-based asset management firm. IIM also does business under the name ING Investment Management U.S., ING Managed Account Group and ING Investment Management Americas. IIM manages investments for both individual and institutional investors. IIM is a wholly owned subsidiary of defendant ING Groep.

18.     Defendant Richard Kilbride was the Head of Fixed Income for Managed Accounts at IIM during the period relevant to this action. Kilbride had responsibility for the investment-grade managed account business. Previously, he spent 12 years at Merrill Lynch, leading a team managing leveraged loans and high-yield bonds. During all times relevant herein, Kilbride was directly responsible for Mashreq's ING Intermediate Fixed Income Account and had day-to-day responsibilities for management of plaintiff's account at ING. Kilbride is currently employed at IIM as Head of Fixed Income for Managed Accounts.

19.     James Kauffmann, a relevant non-party, was at the time relevant to the events that occurred herein, the Senior Vice President and Chief Investment Officer of Fixed Income at IIM. Kauffmann began his career as a Debt Capital Markets associate between 1986 and 1989 at the notorious Drexel Burnham Lambert. After spending a few years here and there, Kauffmann ended up at ING. Kauffmann's public bio at IIM states that he was the head of the global fixed income strategy team, which was responsible for formulating firm-wide asset allocation policy for fixed income funds. Significantly, Kauffmann admits that he was the head of teams responsible for all trading, portfolio management, quantitative risk and research. Kauffmann also touts his own ability

as a "[h]ighly effective communicator of philosophy, process and strategy to a variety of clients … in

the US, Europe, Asia and Australia." Prior to that for five years between 1998 and 2003, Kauffmann

was the Vice President and Senior Portfolio Manager at IIM, where he modestly admits he

"conceived and developed fixed income investment process … a unique investment relative value

process that came to serve as the standard across all ING's fixed income strategies." Kauffmann was

"The Face" of ING for client presentations. Kauffmann was one of the primary ING executives

who spoke at the presentation made to plaintiff Mashreq leading to the issues arising out of this

Complaint. Effective January 13, 2009, in a supplement filed with the SEC, ING removed

Kauffmann as the portfolio manager for all of the following funds:

|   |   |
|---|---|
| a. | ING Balanced Fund |
| b. | ING VP Balanced Portfolio |
| c. | ING Global Bond Fund |
| d. | ING Limited Maturity Bond Portfolio |
| e. | ING Intermediate Bond Fund and VP Intermediate Bond Portfolio |
| f. | ING SPorts Core Fixed Income Fund |
| g. | ING SPorts Core Plus Fixed Income Fund |
| h. | ING Strategic Allocation Funds and ING VP Strategic Allocation Portfolios. |

Kauffmann is currently a private investor and fund manager based in Sarasota, Florida.

20.     Robert Kinsey, a relevant non-party, was, at all times relevant to the events that

occurred herein, the Senior Vice President and Senior Product Specialist at IIM. Kinsey originally

started as a fixed income portfolio manager with the Phoenix-based Pilgrim Funds, which was

acquired by ING. Starting 2003, Kinsey was a senior product specialist for the taxable bond team in

Atlanta, Georgia and represented various ING bond funds, including ING's Global, Core and Core

Plus to institutional investors. Kinsey worked directly with Kilbride and Kauffmann on the Mashreq

account and participated both in the presentation leading to the Revised 2007 Mandate and the

subsequent concealment of defendants' bad acts. Kinsey is currently employed as a Senior Client

Portfolio Manager at Oppenheimer Funds in New York.

21.     During the relevant period described herein, defendants aided and abetted, encouraged and rendered substantial assistance to each other in furthering the deception on plaintiff by purchasing prohibited securities in contravention to plaintiff's wishes. In addition to acting on their own behalf individually, defendants, each of them, are and were acting as the agent, servant, employee, joint venturer, and representative of, and with the knowledge, consent and permission of, and in concert with every other defendant and within the course, scope and authority of that agency, service, employment, representation, joint venture, and conspiracy. All defendants here are liable, either directly or vicariously under various alternative theories of secondary liability, including aiding and abetting, agency, conspiracy, furnishing the means for another's violations, *respondeat superior* and alter ego.

22.     Plaintiff is currently unaware of the true names, capacities, or basis for liability of defendants Does 1 through 10, inclusive, and therefore sues said defendants by their fictitious names. Does 1 through 10 are individuals, associations or corporations who/that are affiliated or related to the defendants, who will be specifically identified and named as discovery progresses and their roles in the wrongdoing at issue is revealed.

23.     At all times mentioned in the Counts alleged herein, each and every defendant was an agent, representative, affiliate, or employee of each and every other defendant, and in doing the things alleged in the Counts stated herein, each and every defendant was acting within the course and scope of such agency, representation, affiliation, or employment and was acting with the consent, permission and authorization of the other defendants. During the time period relevant herein, defendants agreed to misrepresent to Mashreq the material facts at issue herein and/or not to notify plaintiff about the scope and nature of the material misrepresentations and/or omissions as detailed herein that resulted in injury in fact to Mashreq. All actions of each defendant, as alleged in the Counts stated herein, were ratified and approved by the other defendants or their respective

directors, officers and/or managing agents, as appropriate for the particular time period alleged herein. Mashreq is informed and believes, and on that basis alleges, that defendants Does 1 through 10, inclusive, and each of them, are in some manner liable to Mashreq, and/or are proper and necessary parties to this action in light of the relief requested. Mashreq will amend the complaint (if necessary) to allege their true names, capacities or basis for liability when the same have been ascertained.

## JURISDICTION AND VENUE

24.     This Court has jurisdiction over this action. Mashreq is a foreign bank and has its principal place of business in the United Arab Emirates. ING Groep is an organization that is based in The Netherlands. IIM has its headquarters in New York. Individual defendant Kilbride was a United States resident at the time the events relevant to this lawsuit occurred. The parties are of diverse citizenship to plaintiff and the amount in controversy exceeds $5 million exclusive of interests and costs. The Counts alleged herein are under New York State law, including common law fraud and breach of contract. This Court has subject matter jurisdiction pursuant to 28 U.S.C. Section 1332(a)–(d).

25.     Venue is proper in this District pursuant to 28 U.S.C. Section 1391(a). The violations of law alleged herein occurred in part in this District, including the misrepresentations and omissions leading up to the execution of the Revised 2007 Mandate that occurred in New York.

26.     The agreement between the parties contains a forum selection clause stating that the agreement shall be governed by and construed under the laws of the State of New York, without regard to choice of law principals.

## SUBSTANTIVE ALLEGATIONS

27.     Mashreq and IIM had a contractual relationship in the form of an investment product that defendants refer to as an ING Intermediate Fixed Income Separately Managed

Account. As discussed herein, this was a product that defendants generally at all times described —

in marketing materials, the IMA, the Original and Revised Mandates, and oral communications — as

a portfolio that would avoid all exposure to non-investment-grade bonds, equities or any speculative

investments that could create significant duration or credit risk. In plain English, this was to be a

safe "boring" portfolio of well-researched investment-grade fixed-income investments with a

maturity of about five years that would generate several percentage points of interest per year.

28.     A current version of ING's sales brochure or "Strategy Brief" (attached as Exhibit 3)

describes its ING Intermediate Fixed Income Separately Managed Accounts as follows:

> Investment Objective
>
>> Seek to provide total return while **preserving capital** largely through
>> the use of treasuries, agencies, and corporate credit securities of 1-10
>> year maturities. The strongest drivers of our investment grade fixed
>> income performance are our positioning for rate trends, which
>> determines duration, and sector relative value assessments across
>> governments, mortgages and corporates which vary in different
>> economic environments.
>
> Investment Strategy and Process
>
> - Sector Allocation: Assess relative value in light of decision on interest
>   rate trends. Provides opportunity to **lower risk through
>   diversification**
>
> - Industry or Sub sector Allocation: Focus on industries based on
>   outlook for economy, yield spreads and financial health
>
> - Issue Selection: **Limit holdings generally to higher quality and
>   more liquid bonds**
>
> Risk Control
>
> - **Preference for liquid bonds from well-established corporations
>   and government agencies**
>
> - **Little exposure to extremely rate-sensitive bonds with high
>   durations or structured products**

(Emphasis is added here as elsewhere unless otherwise noted.)

29.     The brochure describes additional characteristics of the average ING Intermediate Fixed Income Account: an average maturity of 4.7 years and an average credit quality composition of: Cash 4%; AAA 30%; AA 28%; A 30%; and BBB 8%.

30.     The composition of the average separately managed account in terms of sectors was reported as follows:

| Security Type | Percent of Average Portfolio |
| --- | --- |
| Cash | 4% |
| U.S. Treasury Securities | 27% |
| Agency Securities (guaranteed) | 16% |
| Corporate Debt | 49% |
| Mortgage-backed Securities | 4% |

31.     Finally, the brochure provides the historical performance of the average ING Intermediate Fixed Income Account:

| Year | Net Returns |
| --- | --- |
| 2011 | 3.10% |
| 2010 | 3.48% |
| 2009 | 2.63% |
| 2008 | 3.44% |
| 2007 | 6.09% |
| 2006 | 3.08% |
| 2005 | 1.19% |
| 2004 | 1.82% |
| 2003 | 2.80% |
| 2002 | 9.91% |

32.     In this conservative context, defendants were to add value in the form of original research — that is, fundamental or credit research — that would allow ING to purchase bonds on Mashreq's behalf "at a discount to their intrinsic value," creating a further margin of safety and value for Mashreq. In return for payment of certain fees by Mashreq, defendants were under a duty to

invest Mashreq's investment funds in a portfolio that adhered to the Revised 2007 Mandate that was incorporated by reference into the IMA.

33.     Indeed, IIM touts as its "investment mission" finding "unrecognized value ahead of consensus" by active management, claiming that its portfolio management teams seek "original insights on markets and securities and a vision of investment potential that differs from the consensus view." As detailed below, ING did everything contrary to this stated investment mission in connection with its client Mashreq.

34.     Further, IIM represents that it "appl[ies] proprietary research and analytics, portfolio diagnostics and risk management to the development of investment solutions in pursuit of [ING] clients' objectives." IIM reinforces its commitment to "investing responsibly and delivering client-oriented investment solutions and advisory services across asset classes, geographies and styles." IIM's representations were false and misleading. None of these statements was true in connection with Mashreq's investments.

35.     Mashreq's investment in the ING Intermediate Fixed Income Account was governed by the IMA. The IMA, in turn, limited defendants' discretion to the boundaries of the Investment Guidelines (also referred to herein as the "Mandate"). Section 2(a) of the IMA states:

> Under this Agreement, IIM shall have complete discretion and authority to manage the Account on Client's behalf and at Client's risk, **subject to any written guidelines governing the Account set forth in Schedule A or which client may provide from time to time (the "Investment Guidelines")**, and is hereby appointed Client's agent and Attorney-in-Fact for that purpose.

Here, the IMA states that Mashreq's assumption of risk is "subject to" the Mandate. That is, authorized investments that fall within the confines of the Mandate are assumed by Mashreq, while the risks of unauthorized investments — investments outside of the Mandate — are not assumed by Mashreq. Instead, the risks of unauthorized investments are presumably assumed by ING.

36.     Paragraph 3(a) and (b) of the IMA expressly allow IIM to use affiliated broker-dealers to execute trades for the account. The IMA even specifies that the client (Mashreq) consents to ING Furman Selz Financial Services serving as broker-deal for trades for the account. Although there was no way for Mashreq to know it when it signed the IMA, this was an unusual arrangement. More reputable investment advisers would generally avoid doing any brokerage business with an affiliated broker-dealer because of the raft of conflicts-of-interest that such an arrangement would create. Here, for example, the commissions earned from the account likely dwarfed the management fees. Internally, IIM and the IIM team managing the account were likely "credited" (in ING's internal accounting) with as much as half of these commissions. These commissions were an important part of ING's motive in committing the fraud as detailed herein. Specifically, ING's additional motive in broadening the investment guidelines in the first place was so that it could generate substantial commissions and fees — on a scale that would dwarf its Management Fees — by churning its various ING Intermediate Fixed Income Separately Managed Accounts out of investment-grade intermediate bonds and into CDOs, CBOs, CLOs and other structured products.

37.     Another important provision in the IMA is Paragraph 7, Termination of Agreement, which states: "[E]ither Client or IIM may terminate the Agreement by providing the other party written notification. Termination shall take effect 30 days after such written notification has been received." Mashreq had the right to withdraw its money from the care of ING at any time upon 30-days' notice. This is additional key evidence of defendants' motive in committing the fraud detailed herein. Specifically, ING needed to misrepresent its actual intentions in the Revised 2007 Mandate because, had it not done so — had Mashreq known the truth — Mashreq could have and would have terminated the IMA and withdrawn its $108 million from ING's care.

38.     The February 28, 2005 IMA was accompanied by Investment Guidelines or the Original Investment Mandate. The Mandate was revised and amended twice pursuant to Section

2(d.) of the IMA. The first revision occurred on May 28, 2005, shortly after the execution of the IMA and was largely a clarification and refinement of the original Mandate agreed to three months earlier on February 28, 2005. The May 28, 2005 Mandate (hereinafter the "Original Investment Mandate") is attached as Exhibit 1. This Mandate was amended, at the suggestion of defendants, on February 5, 2007. The February 5, 2007, Mandate (referred to herein as the "Revised 2007 Mandate") is attached as Exhibit 2. The differences between the Original Investment Mandate and the Revised 2007 Mandate are some of the key issues in this case.

39.     On November 2, 2006, defendants sought to convince Mashreq to agree to sweeping changes to the Original Investment Mandate. The November 2, 2006 presentation was made by Kauffmann, Kilbride and Kinsey in a meeting with Tasdique Pasha of Mashreq in New York City. Kilbride, Kauffmann and Kinsey used as the basis of their pitch the presentation, "LIBOR Plus Strategies: Increase the Opportunity Set" (the "Presentation," attached as Exhibit 4).

40.     The Presentation described ING's "Investment Philosophy" as follows:

- "Fixed income markets are diverse and fragmented, offering many opportunities and sources of excess returns;"

- "Allocating risk to many small decisions, rather than a few large ones, generates consistent performance;"

- "Original research is focused on buying securities at a discount to their intrinsic value;" and

- "An investment process that fully integrates research and risk management provides superior long-term performance."

Defendants presented an investment philosophy that emphasized minimizing risk through superior research, generating consistent performance, buying securities at a discount to their intrinsic value and fully integrating research and risk management.

41.    The Presentation also described ING's "Investment Process" as a process of "Disciplined Value Discovery" comprised by five sub-processes, graphically depicted as revolving around and consisting of "RESEARCH":

a.    "Strategy;"
b.    "Security Selection;"
c.    "Risk Budgeting;"
d.    "Portfolio Construction;" and
e.    "Monitor Risk/Rebalance."

Defendants promised a five-stage research-based investment process focused on careful security selection and multiple layers of risk management. The promised investment process seemed thoughtful, careful, risk-management-based, and research-based. Indeed ING's "investment process" accorded perfectly with its "investment philosophy" of providing "an investment process that fully integrates research and risk management provides superior long-term performance."

42.    The Presentation goes on to state:

- "Research Drives Portfolio-Level Decisions"

- "Identifying Value at the Sector Level"

- "An Integrated Approach"

- "We focus on the most attractive part of the market"

43.    Then, pages 14 through 15 of the Presentation are devoted to "risk monitoring" and portray impressive-looking tables that purport to deconstruct the risk profiles of bonds based on 25 different factors, in the first table, or 12 factors, in the second table. The impression created by these tables — and the impression that Mashreq was under — was that ING has an extremely sophisticated and sensitive approach to risk management.

44.    The next section of the Presentation is entitled, "Trends in Fixed Income Market." The overall message of this section is that the best way to increase "alpha" is to "release the shackles" of ING by allowing it to engage in short sales and expand its universe of permitted

securities. The Presentation suggests that Mashreq "Expand the universe of alpha levers" and "Add flexibility to reduce market risk (not unidirectional)."

**Defendants' Proposed Modifications to the Original Investment Mandate**

45.    Finally, the Presentation proposes modifications to the Original Investment Mandate governing ING's management of funds on Mashreq's behalf, including:

a.    Allowing non-investment-grade securities;
b.    Removing the maximum 15-year maturity limitation;
c.    Expressly allowing CDOs, CBOs CLOs and other structured products;
d.    Engaging in securities lending and dollar rolls;
e.    Allowing hedged non-dollar exposures;
f.    Allowing use of derivatives for purposes such as currency hedging; and
g.    Allowing the use of pooled or commingled vehicles and ING-affiliated money-market funds.

46.    The most drastic of the proposed changes to the Original Investment Mandate was the third proposal:

Expressly allow CDOs, CBOs, CLOs, and other structured products.

47.    It is important to note that the foregoing proposal states that the revised mandate would "***expressly***" allow CDOs, etc. As we shall see, defendants later argue that CDOs were ***implicitly*** allowed in the Revised 2007 Mandate. However, even ING's original proposal contemplates "expressly allowing" CDOs, not "allowing" CDOs, much less "implicitly allowing" CDOs. Defendants' later argument is belied by their original proposal.

48.    At the November 2006 meeting, Mashreq promptly and clearly objected to the proposal to allow CDOs, CBOs, and CLOs in no uncertain terms. Mashreq struck out this proposal on its copy of the Presentation. *See* Ex. 4 at 35.

49.    And after two months of discussion and exchanges, the description of "Permitted Securities" in the Revised 2007 Mandate does not allow CDOs, CBOs, CLOs, and other structured products, and indeed CDOs, CBOs and CLOs are never mentioned in the Revised 2007 Mandate.

50.     On the contrary, the Revised 2007 Mandate **deletes** the words, "***other structured notes***," from its description of "Permitted Securities." *See* Ex. 2, Guideline 4.

51.     In addition, the Revised 2007 Mandate **adds** the words, "***subordinated bank debt***," to its description of "***Prohibited Investments***," as follows:

> Prohibited Investments — commodities, subordinated bank debt, currencies, equity, or securities whose underlying value is linked to these markets.

Including subordinated bank debt in the list of prohibited investments is telling because CDOs acted like banks. Purchasing a subordinated tranche of one of these CDOs was not materially different from purchasing subordinated bank debt. It is difficult to reconcile the CDO/CLO investments subsequently made by defendants in Mashreq's account in light of this prohibition against subordinated bank debt.

52.     Similarly, the Presentation recommends allowing sub-investment-grade securities in the portfolio (item a. in the list above), a proposal that Mashreq likewise rejected. The Revised 2007 Mandate instead maintains the requirement that all portfolio securities be investment-grade, that is, have a credit rating of "A or better."

53.     After Mashreq rejected changes (a) and (c), they were never brought up again. Changes (a) (Allowing non-investment-grade securities) and (c) (Expressly allowing CDOs, CBOs CLOs and other structured products) are simply not reflected in the Revised 2007 Mandate executed by the parties on February 5, 2007. These changes were not brought up again, and they were not reflected in the Revised 2007 Mandate, because Mashreq would have terminated the IMA and withdrawn its money had they been so reflected. This was the core of ING's fraud. At all times, ING knew full-well that it would put 70% of Mashreq's portfolio in CDOs, but it made certain to conceal this intention from Mashreq because knowledge of the truth would cause Mashreq to withdraw its money.

54.     Change (b) (Removing the maximum 15-year maturity limitation) is reflected in the deletion of item 3, "Maturity," in the Revised 2007 Mandate, thereby explicitly eliminating a previous prohibition against securities with a maturity over 15 years. At the same time, the Revised 2007 Mandate imposes a stricter requirement that the weighted average duration of the portfolio shall not exceed one year, as opposed to a previous limit of three years.

55.     Change (d) (Engaging in securities lending and dollar rolls) is explicitly reflected in the Revised 2007 Mandate with the addition of "MBS dollar rolls" to the list of Permitted Securities.

56.     Change (e) (Allowing hedged non-dollar exposures) and change (f) (Allowing use of derivatives for purposes such as currency hedging) are explicitly reflected in the Revised 2007 Mandate with the addition of the words, "or hedged back to," and "1. … All investments must be denominated in or hedged back to U.S. dollars." They are likewise reflected in item 5 with the deletion of the words "securities with embedded leverage" from the list of Prohibited Investments. They are also reflected in: "10. Derivatives futures, options, and swaps may only be used for the following purposes: a) to hedge currency exposures if applicable. . . ."

57.     On or around February 5, 2007, defendant Richard Kilbride signed the Revised 2007 Mandate on behalf of ING. His signature line is labeled, "ING Authorized Signature."

58.     Following the execution of the Revised 2007 Mandate on February 5, 2007 — unbeknownst to Mashreq — defendants blatantly violated the Revised 2007 Mandate and loaded Mashreq's portfolio with illiquid toxic securities. Specifically, between February and July 2007, ING purchased a total of **$73 million** in illiquid toxic securities in the context of total portfolio of $108 million.

59.     In other words, in a five-month period, defendants invested approximately **70%** of Mashreq's conservative investment-grade intermediate fixed-income portfolio in illiquid toxic sub-investment-grade securities.

60.     And throughout this period, as discussed below, defendants actually concealed the true nature of these 11 toxic illiquid securities from Mashreq by, among other methods, withholding information from Mashreq about the unregistered securities, even when Mashreq requested defendants' due diligence and valuation supporting their purchases of such securities. Defendants also meticulously avoided singling out these bizarre securities as such in portfolio reports but instead hid them amongst conventional securities. They also intentionally and misleadingly categorized them as ABS or asset-backed securities in more detailed portfolio reports. As defendants were undoubtedly aware, this categorization of the securities as ABS would imply to most market participants that these were securities backed by consumer loans, such as car loans, consumer loans and credit cards.

61.     On July 31, 2007, Mashreq discovered in a conference call with Kinsey, Kilbride and Kauffmann of ING that the 11 securities grouped under the category "ABS" were not what most would describe as ABS:

> MashreqBank realized that the "structured credit" was being labeled as ABS. ING informed us that even though valuations were tough in the current market conditions, the CDO/CBO holdings were "money good". We were also informed that the CDO/CBO holdings were being marked-to-model.

As this contemporaneous account of Mashreq's July 31, 2007 conference call with defendants reveals, defendants' response as their fraud and breach of contract and fiduciary duty began to come to light — consistent with their conduct throughout — was to engage in additional lulling, obfuscation and outright misrepresentation. Defendants informed Mashreq that the securities were "money good." The reality was that defendants knew they had no basis whatsoever for stating that the securities were "money good" because the securities were black boxes.

62.     The securities were being "marked-to-model." Marked to what model? How can one model a black box? Defendants told Mashreq, "Valuations were tough in the current market conditions." Even this was false. Valuations were not "tough;" instead they were impossible. Per the

securities' offering circulars, neither ING nor anyone else had any detailed knowledge whatsoever of the pools of collateral underlying any of the "Russian doll" securities in question, much less any means of calculating the value of Mashreq's particular tranches of the collateral based on the incredibly complex "waterfall" and subordination structures particular to each security. Indeed, had defendants not been engaged in ongoing fraud, this would have been the natural time to inform Mashreq that Mashreq owned 30% of some of the tranches in question. If, in addition, only three or four investors own a security, it will obviously be impossible to determine a market price. Further, if one has no knowledge about the assets that comprise the security, it is by definition impossible to "model" the security.

63.     On August 1, 2007, Mashreq formally requested — in a telephone call with Serge Rahman of ING — the following information:

> We asked for the following:
>
>> a.     The latest collateral report on all the CDO/CLO positions
>>
>> b.     Purchase/Sale report for the past 2 years
>>
>> c.     Any model that you may use to value the CDO/CLO positions
>
> (NO RESPONSE)

64.     As indicated above, Mashreq received no response from defendants to this and subsequent requests for information and ING's research, due diligence and valuation about the toxic illiquid securities. It was becoming clear to Mashreq that contrary to defendants' much-touted philosophy of investing based upon rigorous research, they had either done no such research in connection with the purchases of the 11 illiquid securities in Mashreq's portfolio and had recklessly and in breach of contract purchased them or were intentionally trying to hide from Mashreq the true nature of the securities.

65.     Even as defendants refused to respond to Mashreq's requests for information about the securities, defendants **did** have time to send two defensive e-mails dated August 24 and September 16, 2007. Both e-mails were sent by Kauffmann with copies to Kinsey and defendant Kilbride.

66.     The August 24, 2007 e-mail (attached as Exhibit 5) states in pertinent part:

> I met with Rob Kinsey to discuss the issues relating to the Mashreqbank portfolio … Rob and I addressed in detail your position that the purchase of CDOs/CLOs was not permitted by the investment guidelines for the portfolio. I respectfully disagree, as I believe that the February 2007 guidelines do permit CDOs/CLOs. I do not recall at our November 2006 meeting discussing whether CDOs/CLOs were permissible under Mashreqbank's internal guidelines. But it is important to note that discussion of the portfolio guidelines continued for a period of several months after that meeting. A primary goal of this collaborative effort was to ensure that IIM had the appropriate flexibility to target Mashreqbank's return objectives for the portfolio, and the February guidelines were the culmination of that effort.
>
>                                   ***
>
> You have requested that IIM buy the CDOs/CLOs at cost. Because we believe that these investments were permitted, we are not prepared to do that.

67.     Three features of this August 24, 2007 e-mail bear comment. First, the e-mail demonstrates that **Mashreq's** immediate reaction upon learning about the securities was that "the purchase of CDOs/CLOs was not permitted by the investment guidelines for the portfolio." In other words, the e-mail memorializes — in defendants' own words — a reaction on the part of Mashreq that indicates that it has been defrauded.

68.     Second, the August 24, 2007 e-mail concedes that if the purchase of the 11 securities at issue in this case was "not permitted by the investment guidelines for the portfolio," then IIM should repurchase them from Mashreq at cost. Specifically, the e-mail states: "You have requested that IIM buy the CDOs/CLOs at cost. Because we believe that these investments were permitted, we are not prepared to do that." Defendants were not willing to buy the positions at Mashreq's cost

**because** defendants believed that the investments were permitted, and the **only** justification that defendants state for not repurchasing the investments at cost is that they believed they were permitted. Therefore, defendants' own assertion implies that if the opposite were true and the investments were **not** permitted, they **would** be required or prepared to repurchase them at cost. This admission by defendants reveals their own immediate reaction and position — in their own words — regarding appropriate remedies in this case. Defendants believe that if the securities fall outside of the Mandate, they should be repurchased by ING at Mashreq's cost, thereby restoring the *status quo ante*.

69.     A third notable feature of the August 24, 2007 e-mail is the absence of any discussion about **why** the Revised 2007 Mandate should be construed as permitting CDOs/CLOs. Instead the e-mail simply asserts, "I believe that the February 2007 guidelines do permit CDOs/CLOs," without further explanation. In particular, there is no mention in the August 24, 2007 e-mail of the words, "embedded leverage," that will figure so prominently in the September 16, 2007 e-mail. This failure even to mention the later argument, which was artificial and contrived on its face, further reinforces the argument's artificiality. Had it not been a fraudulent or "made-up" argument, it would have appeared here in some form.

70.     Mashreq's contemporaneous response to defendants' August 24, 2007 e-mail was astonishment, as expressed in a reply e-mail dated August 29, 2007 (attached as Exhibit 6) which states in full:

> James,
>
> The glaring fact is that your team purchased CDO/CLO tranches when we had verbally agreed that CDO/CLO tranches would not be permissible in response to IIM's proposed guideline: "Expressly allow CDOs, CBOs, CLOs and other structured products."
>
> In light of the conversation we had regarding the above guideline proposed by yourselves, I am astonished and perplexed that you do not recall our disallowing CDOs/CLOS as permissible instruments. I am confident that I

23

had made the position very clear and members of your team had taken notes to the effect.

It is important to note that, prior to finalizing the guidelines which you rightly point out took several months, we had a couple of conference calls where we discussed on MBS dollar rolls and subsequently on a few additions/deletion on wordings but never touched on the inclusion of CDO'S and CLO'S. I believe all conversations are recorded at your end as in ours.

I request you and your team to revisit the November meeting notes and let us know your course of action. Three other members of your team were present at the November meeting. I am sure at least some of them if not all recall the discussion specifically on the above guideline.

Regards,
Tasdique Amin Pasha
Managing Director, Rates & Structured Solutions
Mashreq

71.     In this reply to defendants' August 24, 2007 e-mail, Mashreq makes several observations. First, Mashreq points out that not only did it reject the proposed inclusion of CDOs/CLOs in the portfolio, but also that it did so in an emphatic fashion. Tasdique Pasha is "astonished and perplexed that you do not recall our disallowing CDOs/CLOS as permissible instruments." He "made the position very clear." He recalls that the ING executives present, including Kauffman, Kinsey and defendant Kilbride "had taken notes to the effect."

72.     Second, this e-mail memorializes the fact that there were three ING managers present at the November presentation, all of whom witnessed Mashreq's emphatic and unequivocal rejection of the inclusion of CDOs/CLOs in the portfolio, and at least some of whom Tasdique Pasha witnessed taking notes when he made such statements. **It therefore required a conscious and coordinated effort for defendants to insure that all such contemporaneous notes were destroyed and that the recollections of all three individuals had been suborned to align with defendants' position that Mashreq had taken no such position, or that they "could not recall" that Mashreq had taken such a position.**

73.     During the next three weeks, defendants apparently sought the assistance of counsel and prepared an intricate legal defense that they set forth in their lengthy September 16, 2007 e-mail (attached as Exhibit 7). This e-mail is also incredibly fraudulent and further establishes that defendants acted with undeniable scienter.

74.     As a threshold observation, perhaps the most striking feature of the September 16, 2007 e-mail is the contrast between the care and effort involved in its preparation versus defendants' unmoving refusal to provide any help or information whatsoever in response to Mashreq's desperate requests for even the most basic information about the securities themselves and Mashreq's risk exposures. These omissions furthered defendants' fraud, because they knew that their only remaining hope was that Mashreq would not uncover the shocking true nature of the 11 toxic illiquid securities — which was that ***they were unregistered, blind, fee-laden pools of below-investment-grade loans, rife with conflicts of interest and often avoiding any involvement by outside accountants, as discussed below***. However, the omissions were not accompanied merely by silence, but instead by defendants' affirmatively disingenuous, misleading and manipulative e-mails of August 24 and September 16, 2007.

75.     The first part of the September 16, 2007 e-mail — defendants' detailed and nuanced legal argument to justify their conduct — states in pertinent part:

- The explicit deletion of the prohibition on embedded leverage, which deletion was reviewed and accepted by Mashreqbank, gave us clear authority to invest in CDOs.

- You suggested that permission to invest in CDOs is nowhere to be found in the Feb-'07 guidelines. Permission to invest in CDOs is indeed found in the new guidelines, with the enhanced ability to invest in ABS without regard to embedded leverage. With the deletion of the prohibition on embedded leverage, express reference to CDOs as permitted investments would have been redundant. Your reference to subordinated debt as a newly permitted asset type illustrates this point because there is no express reference in the Feb-'07 guidelines to subordinated debt being permitted securities.

Rather, non-bank subordinated debt is permitted because it is a type of permitted security (in this case, corporate debt) that is not otherwise prohibited. Listing non-bank subordinated debt as a permitted security would have been redundant. Similarly, CDOs are permitted because they are a type of permitted security (ABS) that is not otherwise prohibited. If a specific type of ABS was to be prohibited under the Feb-'07 guidelines, it should have been referenced under the "Prohibited Investments" section of the guidelines, like bank subordinated debt.

76.     In contrast to the August 24, 2007 e-mail in which defendants can think of no justification for their assertion that CDOs and CLOs are permitted securities, here they — or their counsel — have pored over the changes to the Mandate and wrongly believe that they have managed to find a straw to which they can grasp. To wit, they contend that the deletion of the words, "securities with embedded leverage," from Prohibited Investments somehow expressly conveyed that CDOs and CLOs were now permitted. This is obviously a lie, and it is moreover, under the circumstances, obviously an intentional lie.

77.     Embedded leverage means leverage that is built into or "embedded" in a security, as opposed to leverage that one achieves by using borrowed funds. For example, derivatives contain embedded leverage. Futures and forward contracts contain embedded leverage. Options contain embedded leverage. Swaps contain embedded leverage. Levered ETFs (exchange-traded funds) contain embedded leverage. Some CDOs and CLOs also contain embedded leverage. All of these securities create a magnified exposure to changes in the value of the underlying instrument or market.

78.     For example, the Directive on Alternative Investment Fund Managers (published in the *Official Journal of the European Union*) identifies two types of leverage: 1) leverage arising from borrowing of cash or securities, and 2) leverage embedded in financial derivatives.[1] Similarly, the

---

[1] *See* http://www.linklaters.com/Publications/20100218/Pages/13_Leverage.aspx.

paper, "Hedge Funds, Leverage and Counterparty Negotiations," published by JPMorgan Alternative Asset Management, puts the phrase "embedded leverage" at the top of its list of the ways in which hedge fund managers can obtain leverage: "Embedded leverage in options, futures, and other securities."[2] In the April 14, 2009, article, "Discourse about Leverage," published in *EconoMonitor*, economist Satyajit Das states: "Derivatives are routinely also used to create 'embedded' leverage by increasing the amount of potential gain or loss for a given event."[3] As yet another example, the abstract of Andrea Frazzini and Lasse H. Pedersen's article, "Embedded Leverage," states:

> Many financial instruments are designed with embedded leverage such as options and leveraged exchange traded funds (ETFs). Embedded leverage alleviates investors' leverage constraints and, therefore, we hypothesize that embedded leverage lowers required returns. Consistent with this hypothesis, we find that asset classes with embedded leverage offer low risk-adjusted returns and, in the cross-section, higher embedded leverage is associated with lower returns.[4]

79.     As these examples demonstrate, the term, "embedded leverage," refers to leverage that is created by means other than borrowing funds. The term is used most frequently to refer to leverage created in derivatives such as options and futures.

80.     One of the largest changes made to the Revised 2007 Mandate was the inclusion of derivatives, options and swaps, which the Revised 2007 Mandate also clearly states in item 10 may be used only for specific and limited purposes such as hedging currency exposures, adjusting dollar-weighted duration of the portfolio and protecting against downside on credit defaults. The deletion

---

[2]*See* https://www.jpmorgan.com/cm/BlobServer?blobkey=id&blobwhere=1158630194686&blobheader=application%2Fpdf&blobcol=urldata&blobtable=MungoBlobs.

[3] *See* http://www.economonitor.com/blog/2009/04/discourse-about-leverage/.

[4] *Available at* http://web-docs.stern.nyu.edu/old_web/finance/docs/pdfs/Seminars/113f-frazzini.pdf

in item 5 of the prohibition against securities with embedded leverage plainly went hand-in-hand with this change. The only reasonable interpretation of the deletion of the prohibition was simply that it was necessary given the inclusion of futures, options, swaps and derivatives in the Revised 2007 Mandate.

81.     Meanwhile, every security type that was in truth added as a new permitted security in the Revised 2007 Mandate — such as reverse repurchase agreements, options, derivatives, swaps, and MBS dollar rolls — were ***indeed expressly*** referenced in the Revised 2007 Mandate. In fact, most of them were expressly referenced twice: in item 5, "Permitted Securities" and in item 10 regarding limitations on the use of derivatives, futures, options and swaps.

82.     Instead, the September 16, 2007 e-mail makes a fraudulent attempt to lead Mashreq to believe that CDOs/CLOs — the securities in which IIM invested 70% of Mashreq's portfolio — were the sole newly permitted security in the Revised 2007 Mandate ***not*** to be expressly referenced. Indeed it would have Mashreq believe that it was the only permitted security that did not have ***any*** exposure limits under guideline 6. No, when it comes to CDOs and CLOs, the September 16, 2007 e-mail contends, the deletion of the prohibition against securities with embedded leverage is to be viewed as "code" from which Mashreq should have somehow inferred that CDOs and CLOs were newly permitted securities. And presumably — at the risk of being facetious — the failure to make any mention of such securities under "exposure limits" is the reason why defendants felt free to invest 70% of the portfolio in them. The e-mail argues:

> Permission to invest in CDOs is indeed found in the new guidelines, with the enhanced ability to invest in ABS without regard to embedded leverage. With the deletion of the prohibition on embedded leverage, express reference to CDOs as permitted investments would have been redundant.

Apparently, this battle against redundancy was limited to CDOs and CLOs, because every other newly permitted security is "redundantly" mentioned at least once — and in most cases twice — in the Revised 2007 Mandate. This entirely artificial and cynical last-ditch argument by ING furthered

its fraud and is further evidence that it engaged in knowing, intentional fraud throughout its involvement with Mashreq.

83.    The September 16, 2007 e-mail continues:

> We understand that Pasha recalls stating at the November 2006 meeting that Mashreqbank did not want CDOs in its portfolio. **We cannot tell you that this did not occur**, but neither Rob nor I can recall this specific discussion. Rob circulated proposed guideline revisions to Mashreqbank in good faith, based on his takeaways from the meeting. Mashreqbank had multiple opportunities to make, and did make, substantive comments to the draft guidelines before they were accepted as final by both parties. We respectfully suggest that Mashreqbank bore some responsibility for ensuring that its guidelines reflected its intentions.

84.    Here, defendants bend over backwards — "We cannot tell you that this did not occur" — to insure that they will not be revealed as liars as a result of failing to recollect Mashreq's emphatic rejection of CDOs/CLOs as permitted investments. Their hedging here was advisable, since Mashreq's contemporaneous notes from the meeting do in fact provide evidence that Mashreq stated at the meeting that it did not want CDOs/CLOs in its portfolio. Most likely there are notice, e-mails and other correspondence in defendants' possession that also confirm Mashreq's refusal. In other words, here again ING is caught in a lie, a lie that any reasonable person or jury could deduce immediately.

85.    After the e-mail goes on to make additional legal arguments in the alternative to defendants' core argument that the deletion of the prohibition against securities with embedded leverage somehow implied that CDOs and CLOs were permitted securities, the September 16, 2007 e-mail continues:

> Both parties have the benefit of one particularly helpful fact: IIM's belief that the fundamentals of the particular investments at issue are generally sound notwithstanding the current mark-downs and illiquidity. **As I stated in our last call, we believe that there is a very good likelihood that the securities would not ultimately bear any loss if retained for an appropriate period of time.**

> Although we are not typically in the business of taking on risks from our client's portfolios where we do not believe there has been a violation of investment guidelines, we continue to consider your position. . . .

Once again, defendants make statements that were unquestionably fraudulent. As discussed in greater detail below, plaintiff's investigation into the nature of the securities in question has revealed that the 11 toxic illiquid securities in question were unregistered, blind, fee-laden pools of below-investment-grade loans, rife with conflicts of interest and often avoiding any involvement by outside accountants. In other words, these were black boxes. There was no basis upon which defendants could express any belief about the "fundamentals" of the securities being "generally sound" because by definition neither defendants nor anyone else had access to any information about any of those fundamentals.

86.     Again, these securities were black boxes. They contained thousands of sub-investment-grade loans that the sponsoring banks wanted to move off of their books as well as unspecified "synthetic exposures" to which the sponsoring banks themselves were the counterparties. Other than meeting broad parameters regarding diversification, the sponsors of these securities did not need to reveal anything about what they contained. Thus, for defendants to state that "the fundamentals of the particular investments at issue are generally sound notwithstanding the current mark-downs and illiquidity" was not only false and misleading, it is also overwhelming evidence of *scienter*, because plaintiff can state with certainty that defendants had no information about those fundamentals. Given the very terms of the securities, defendants must have known that it was misleading to claim any knowledge about their fundamental contents and prospects, while at the same time refusing to provide its client — Mashreq — with any of the due diligence, research and valuation supporting defendants' decision to purchase the 11 securities. Plaintiff can assert with certainty that defendants had no knowledge whatsoever about the securities or their prospects, because the very terms of the securities expressly prevented any such knowledge.

87.     A few months after the September 16, 2007 e-mail, defendants proposed to Mashreq the draft of a buy-back offer dated December 14, 2007. The draft offers to repurchase from Mashreq *two* of the eleven toxic illiquid securities at prices approximating prevailing market prices in return for a sweeping release. In other words, defendants offered to free Mashreq from two of the eleven illiquid roach motels into which its funds had been placed in return for a sweeping discharge of all of defendants' liability for their fraud. Knowing what plaintiff now knows about the true nature of the securities in question, it is clear that this buy-back offer was instead a further act of fraud and fiduciary duty by defendants. Throughout these events, defendants' overarching and most urgent priority was to dissuade or prevent Mashreq's discovery of the true nature of the 11 toxic illiquid securities. Defendants wished to free themselves of any connection to the securities before Mashreq discovered their true nature.

88.     In short, this case involves the following chronology: (1) an attempt by ING to talk Mashreq into dramatic changes in the existing conservative investment guidelines; (2) an express rejection by Mashreq of all substantive proposed changes; (3) no further mention of the proposed changes by ING from that point forward; (4) the memorialization of Mashreq's rejection of the substantive proposed changes in a revised mandate that indeed did not include the changes, a revised mandate that was entirely fraudulent from the standpoint of defendants because they never intended to follow it; (5) defendants' deliberate and extreme flouting of the carefully discussed and negotiated Revised 2007 Mandate; and (6) contemporaneous lulling, misrepresentations and omissions — including misclassifications of securities on reports, by ING, the August 24 and September 16, 2007 e-mails, and the buy-back offer — in an attempt to avoid discovery.

89.     Mashreq did not agree to the buy-back offer. Thereafter, Mashreq mitigated its initial losses of over $60 million when some liquidity had returned to the markets. Nevertheless, Mashreq ultimately experienced a total of over $43 million in losses as a result of defendants' extreme

conduct in investing 70% of its portfolio into bizarre illiquid securities (that were not mentioned and not permitted in the Revised 2007 Mandate, ING's key misrepresentation that lulled Mashreq into continuing to entrust ING with their $108 million) and then lying repeatedly in order to prevent the discovery of their fraud.

## THE TOXIC ILLIQUID SECURITIES

90.     In portfolio reports, defendants intermingled the 11 toxic securities in question with bonds from Caterpillar, Goldman Sachs, Vodafone, Sallie Mae and Fannie Mae in a manner that made them seem benign or even respectable. For instance, here is an example of how ING reported its holdings to Mashreq:

> Bear Stearns Co Inc
> Caterpillar Fin Serv Corp
> Commercial Industrial Finance
> Emporia Preferred Funding
> Fed Home Loan Mtge Corp Gold
> Fed Home Loan Mtge Corp Gold
> Fed Natl Mtge Assn
> Fed Natl Mtge Assn
> Fraser Sullivan CLO Ltd
> Galena CDO Ltd
> Goldman Sachs Group Inc
> Harch CLO Ltd
> Libertas Preferred Funding Ltd
> Liberty Harbour CDO Ltd
> Madison Park Funding Ltd
> Octagon Investment Partners XI
> SLM Corp
> Sigma Finance Corp
> Taberna Preferred Funding Ltd
> Vodafone Group plc

The 11 "shadow banking" vehicles are simply hidden in the midst of this list. And those 11 illiquid toxic securities — even when separated from the rest of the portfolio — have respectable-sounding names:

> Commercial Industrial Finance
> Emporia Preferred Funding
> Fraser Sullivan CLO Ltd

32

Galena CDO Ltd
Harch CLO Ltd
Libertas Preferred Funding Ltd
Liberty Harbour CDO Ltd
Madison Park Funding Ltd
Octagon Investment Partners XI
Sigma Finance Corp
Taberna Preferred Funding Ltd

91.     In other words, far beyond being violations of the Revised 2007 Mandate that did not belong in the portfolio in the first place, these securities were not even flagged by defendants in their main portfolio reports as even mildly risky or unusual.

92.     It was only when Mashreq conducted its own investigation that it was able to identify and trace the shadowy, unregistered securities in question. And only through much further research and study of the securities themselves has Mashreq come to "understand" that the core feature of the securities is that they are designed not to be understood.

**Characteristics of the Toxic Illiquid Securities**

93.     Plaintiff does not refer to the 11 securities in question as "illiquid toxic securities" lightly. It has required months of investigation, research and analysis for plaintiff even to trace, uncover and understand the private, unregistered, opaque, fee-laden and utterly illiquid securities in question. As it turns out, such a description is — if anything — an understatement.

94.     These securities are examples of a phenomenon that has been variously described as "shadow banking," "Russian doll finance" or "vehicular finance," a phenomenon described as follows by Les van Dam, a former trader at Goldman Sachs:

> New, complex derivative instruments have been invented, designed to be understood by only a select few traders, and to be lapped up by the naïve. The asymmetric pay-off is an affront to morals and ethics.

95.     To give some idea of the difficulties involved in such an investigation, plaintiff will use the security to which ING refers as "Madison Park Funding Ltd" as an example. Defendants made a $10 million investment on Mashreq's behalf in Madison Park Funding Ltd.

96.     As it turns out, no such security has ever been registered. Moreover, no issuer for such a security could be found because — as plaintiff eventually discovered — the "Issuers" were shell companies. When plaintiff was finally able to locate — with immense difficulty — a resource that did have records pertaining to "Madison Park Ltd," including copies of the private offering memoranda, it turned out that *71 tranches* of Madison Park Funding had been issued.

97.     In which of these 71 tranches had ING invested Mashreq's $10 million? By a further process of elimination based upon maturity dates and a (partial) private securities identification number, plaintiff was eventually able to deduce that the issuance that defendants had purchased for Mashreq's account was Madison Park Ltd IV — not to be confused with Madison Park Ltd I, II, III, V, VI, VII, VIII or IX — and that the particular Class of Madison Park V that had been purchased was Class C — not to be confused with Classes A-1a, A-1b, A-2, B, D, E, Y or Z of Madison Park Ltd IV.

98.     After identifying the 11 specific securities, plaintiff analyzed the incredibly opaque offering documents upon which each was based. Taken as a whole, these offering circulars were plainly exercises in providing legal cover for what were essentially fee-laden blind pools crammed with the cast-off loans of major banks. Plaintiff would submit that they were obviously — from the perspective of a reasonable investor — exercises in deliberate obfuscation and complexity.

99.     However, assuming *arguendo* that the representations made in these offering circulars could have been taken seriously by a reasonable investor, here is an attempt to summarize those representations. The following paragraphs in this section summarize some of the common characteristics of the 11 securities known by defendants when they purchased $73 million of those securities on behalf of Mashreq.

100.   *None* of the 11 securities is registered with the SEC or any other securities regulator. They were unregistered securities which, by definition, could only be sold under certain narrow circumstances and for which there was no ready market.

101.   Indeed the offering circulars for all of the securities specifically warned that sale of even small amounts of the securities on the secondary market would be very difficult. All offering circulars included language such as the following:

> PROSPECTIVE PURCHASERS OF THE SECURITIES SHOULD PROCEED ON THE ASSUMPTION THAT THEY MUST HOLD THEIR INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

102.   Nor were the offering circulars or prospectuses for the 11 securities publicly available. Mashreq was only able to locate the offering circulars after extensive investigation, as described above. Instead, the circulars generally included a legend such as the following:

> *THE FOLLOWING OFFERING CIRCULAR MAY NOT BE FORWARDED OR DISTRIBUTED TO ANY OTHER PERSON AND MAY NOT BE REPRODUCED IN ANY MANNER WHATSOEVER. ANY FORWARDING, DISTRIBUTION OR OTHER REPRODUCTION OF THIS OFFERING CIRCULAR IN WHOLE OR IN PART IS UNAUTHORIZED. SUCH UNAUTHORIZED REPRODUCTION OF THIS OFFERING CIRCULAR MAY RESULT IN A VIOLATION OF THE UNITED STATES SECURITIES ACT AND/OR THE APPLICABLE LAWS OF OTHER JURISDICTIONS.*

103.   To make matters even worse, defendants deliberately purchased between 20% and 50% of the total issuance of nine of the eleven securities for Mashreq, meaning that sale of any of these securities — already very difficult or near-impossible — would now become truly impossible short of accepting a massive discount.

104.   For example, defendants purchased on behalf of Mashreq $10 million of the Class C Deferrable Floating Rate Notes Due 2021 of Madison Park Funding IV mentioned above. The total amount of such Notes issued was $30 million. Therefore, defendants purchased on behalf of Mashreq 33% of the total outstanding amount of the security.

105.    Defendants knew — because of both the inherent illiquidity of the securities as well as the fact that ING had purchased a large percentage of each security on behalf of Mashreq — that Mashreq was for all intents and purposes *locked-up* in these securities until maturity. So what, then, were these maturities? For how far into the future had defendants committed Mashreq's funds? Recall again that this ING Intermediate Fixed Income Account was touted as being limited to liquid holdings in Intermediate bonds. They were as follows:

| Securities | Year |
| --- | --- |
| Commercial Industrial Finance | 2020 |
| Emporia Preferred Funding | 2018 |
| Galena CDO Ltd | 2013 |
| Harch CLO Ltd | 2020 |
| Libertas Preferred Funding Ltd | 2047 |
| Liberty Harbour CDO Ltd | 2040 |
| Madison Park Funding Ltd | 2021 |
| Sigma Finance Corp | 2012 |
| Taberna Preferred Funding Ltd | 2035 |
| Fraser Sullivan CLO Ltd | 2020 |
| Octagon Investment Partners XI | 2021 |

106.    The illiquidity of Mashreq's positions in the securities meant that defendants knew that Mashreq was effectively locked-up in the securities until maturity, that is, until 2047, 2040, 2035, 2021 or 2020. There is simply no way to reconcile locking up 70% of Mashreq's portfolio for so long with any reasonable interpretation — no matter how generous to ING — of the letter or spirit of the Revised 2007 Mandate.

107.    Moreover, intermediate bonds are bonds that have a maturity of one to ten years. Nine of the eleven above securities were not intermediate securities but instead were Long-Term bonds with a maturity of over ten years. Indeed three of the securities had a maturity of 40, 33 and 28 years, respectively. Most intermediate bond funds and indices have average maturities of four to five years. The average maturity of the 11 securities was over 17 years. There is no way to reconcile

the decades of illiquidity created by these 11 securities with the investment style, "Intermediate Fixed Income," represented by ING in the IMA. The utter illiquidity of the positions in question — as well as the core agreement *ab initio* that this was to be an intermediate portfolio — makes this list of maturities evidence *per se* of ING's fraud. The "Issuers" of the 11 securities were shell corporations in the Cayman Islands and Delaware. None of them owned any separate assets or had any operations. Indeed, at least **ten of the eleven** securities listed the **same** addresses as the location of their principal offices:

> 850 Library Avenue, Wilmington, Delaware 19711; and Queensgate House, South Church Street, George Town, Grand Cayman KY1-1108, Cayman Islands, British West Indies.

108.    The person answering the phone number provided in some of the offering circulars for the 850 Library Avenue, Wilmington, Delaware address indicated that he had done "thousands" of these deals. Refusing to provide plaintiff's agents with his name, he stated that his overall view of these "deals" was that they were indeed incredibly risky and non-transparent, but that the purchasers of the securities should have been aware of those risks. When asked his opinion about Mashreq's situation, he expressed shock and described as "ridiculous" and "insane" the concept that anyone would put 70% of a client's portfolio into these securities.

109.    None of the offering circulars provided — or promised — any transparency as to the contents of the "Collateral," "Collateral Obligations" or "Collateral Debt Obligations" (or some similar capitalized term) that were the sole assets of the Issuers — or in some cases merely the basis of a "floating lien." The offering memoranda do no more than describe general characteristics of the thousands of loans that would underlie the notes, such as diversification requirements and interest-coverage requirements. Instead the Collateral for each of these 11 securities was a blind pool or, more precisely, a diversified blind pool.

110.    These blind pools were filled primarily or exclusively with cast-off, low-quality loans of the sponsoring investment banks. In all 11 securities, these loans were mostly or (more often) universally below investment-grade.

111.    For example, the private offering memorandum for Madison Park Ltd IV describes the Collateral Obligations underlying the notes (the Collateral being the sole assets of the shell corporations that "issued" the notes for Classes A-1a, A-1b, A-2, B, C, D, E, Y and Z of Madison Park Ltd IV) as follows:

> The Collateral Obligations will consist primarily of senior secured floating rate leveraged loans made to corporate and other business entities ("Leveraged Loans") and high yield bonds ("High Yield Bonds"). . . . **The Collateral Obligations will be of below investment grade credit quality**.

112.    Several pages later, the Madison Park Ltd IV offering circular that we have been using as an example reiterates in greater detail:

> It is expected that substantially all of the Collateral Obligations will be rated below investment grade. Such debt obligations have greater credit and liquidity risk than investment grade sovereign and corporate bonds. The lower rating of such obligations reflects a greater possibility that adverse changes in the financial condition of an issuer or in general economic conditions, or both, may impair the ability of the Issuer (and, in the case of the Senior Notes, the Co-Issuer) to make payments on the Notes. In addition, issuers of below investment grade debt obligations may be highly leveraged and may not have available to them more traditional methods of financing. During an economic downturn, a sustained period of rising interest rates, or a period of fluctuating exchange rates (in respect of those issuers located in non-U.S. countries), such issuers may be more likely to experience financial stress and may be unable to meet their debt obligations due to the issuers' inability to meet specific projected business forecasts or the unavailability of financing.

113.    To make matters worse, every one of the 11 securities purchased a subordinated position or a **subordinated** "floating lien" on these blind pools. As an example of the subordination language that was included in each of the offering circulars, Mashreq's $10 million position in Madison Park Ltd IV Class C notes was subordinated as follows:

Principal Payments on the Class A–1 Notes and the Class A–2 Notes will rank pari passu (provided that amounts allocated to the payment of the Class A–1 Notes will be paid, first, to the Class A–1a Notes and, second, to the Class A–1b Notes). Payments on the Class B Notes are subordinated to payments on the Class A Notes, payments on the Class C Notes are subordinated to payments on the Class A Notes and the Class B Notes, payments on the Class D Notes are subordinated to payments on the Class A Notes, the Class B Notes and the Class C Notes, and payments on the Class E Notes are subordinated to payments on the Senior Notes. Distributions on the Subordinated Notes are fully subordinated to any required payments on the Rated Notes, fees and expenses. For purposes of subordination, the Class Y Combination Notes will not be treated as a separate Class, but the Class D Note Component and the Class E Note Component will be treated as Class D Notes and Class E Notes, respectively. For purposes of subordination, the Class Z Combination Notes will not be treated as a separate Class, but the Subordinated Note Component will be treated as Subordinated Notes. ***If any Coverage Test is not satisfied as of any Determination Date or in the event of a Continuing Effective Date Confirmation Failure, cash flows otherwise payable to more junior Classes of Notes will be diverted to the payment of principal on more senior Classes of Notes as set forth in the Priority of Payments.*** Interest Proceeds will be diverted, in accordance with the Priority of Payments, to purchase additional Collateral Obligations, (a) if an Effective Date Ratings Confirmation Failure occurs, to the extent required to obtain Rating Agency Confirmation and (b) during the Reinvestment Period if the Class E Reinvestment Test is not satisfied as of the related Determination Date, to the extent of up to 50% of such available Interest Proceeds. Notwithstanding the foregoing, under certain circumstances described herein, Interest Proceeds which would otherwise be used to make payments on the Subordinated Notes will be used to redeem the Class E Notes, whether or not the Senior Notes remain Outstanding. ***None of the Investment Manager, the Trustee, the Initial Purchaser, the Share Trustee or any of their Affiliates or any other person or entity (other than the Co- Issuers) will be obligated to make payments on the Notes. To the extent that any losses are suffered by any holders of the Notes, such losses will be borne by the holders of the Notes, beginning with the Subordinated Notes as the most junior Classes.***

114.    As is also demonstrated — though by no means sufficiently — by the above language and by this discussion in general, the eleven securities were tremendously ***complex***.

115.    As a further example, consider the following language in the Madison Park offering circular that is similar to language that can be found throughout the offering circulars for the 11 securities:

39

When the Issuer invests in a Synthetic Security, it will usually have a contractual relationship only with the counterparty of the Synthetic Security, and not the Reference Obligor. Therefore, the Issuer generally will have no right directly to enforce compliance by the Reference Obligor with the terms of the Reference Obligation nor any rights of set-off against the Reference Obligor, nor have any voting rights with respect to the Reference Obligation. In the event of the insolvency of any counterparty, the Issuer's recourse will be limited to the collateral, if any, posted by the counterparty and, in the absence of collateral, the Issuer will be treated as a general creditor of the counterparty. Consequently, the Issuer will be subject to the credit risk of the counterparty, any collateral posted by the counterparty, the Reference Obligor and the obligors of the Deliverable Obligations, if any. Although the Investment Manager will not perform independent credit analysis of the counterparties, each counterparty (or its guarantor) will be required to satisfy rating requirements described herein.

While the Issuer expects that returns on a Synthetic Security may reflect those of each related Reference Obligation, as a result of the terms of the Synthetic Security and the assumption of the credit risk of the counterparty, a Synthetic Security may have a different expected return, a different (and potentially greater) probability of default and different expected loss and recovery characteristics following a default. Upon the occurrence of a Credit Event, maturity, acceleration or other termination of a Synthetic Security, the terms of the Synthetic Security may permit or require the counterparty to satisfy its obligations under the Synthetic Security by delivering to the Issuer one or more Deliverable Obligations (which may not be the Reference Obligation) or a cash payment (which may be less than the then-current market value of the Reference Obligation). In addition, a Synthetic Security may provide for early termination at a price based upon a marked-to-market valuation, which may be less than the principal or notional amount of the Synthetic Security.

Certain of the Synthetic Securities purchased by the Issuer may be structured as credit default swaps, Credit-Linked Obligations or SAMIs. In any such case, the Issuer may be required to grant the related counterparty a first priority security interest in certain Synthetic Security Collateral. Upon the occurrence of a Credit Event, the related Synthetic Security Collateral will be delivered to the counterparty in exchange for the Deliverable Obligation. The Issuer will have no right to sell or transfer any Synthetic Security Collateral until the Synthetic Security is terminated, sold or matures, even under circumstances where the Synthetic Security Collateral deteriorates in credit quality. In addition, the Issuer may realize a loss upon any sale of Synthetic Security Collateral that has been released to the Issuer under the terms of the Synthetic Security.

Reference Obligations and Deliverable Obligations do not need to satisfy the definition of Collateral Obligation in its entirety. If a Reference Obligation or Deliverable Obligation that is delivered to the Issuer does not qualify as a

Collateral Obligation, the Issuer will not be permitted to include such Reference Obligation or Deliverable Obligation as a Collateral Obligation for purposes of the Collateral Quality Tests, the Coverage Tests or the Reinvestment Requirements and may be required to sell such Reference Obligation or Deliverable Obligation.

116.     The gist of all of the above language is apparently that the Issuers (the two shell companies) plan to enter into various "synthetic security" arrangements with counterparties, and that these arrangements will place the Issuers at risk of being taken advantage of by the "counterparties" in various ways.

117.     Incredibly, in an entirely different section of the offering memorandum it is disclosed that the "counterparties" in question will generally be Credit Suisse and Goldman Sachs themselves. (A division of Credit Suisse is the "Investment Manager" for Madison Park Ltd IV and Goldman Sachs is the "placement agent" or underwriter.)

118.     The 11 securities were rife with multiple levels of serious conflicts of interest. The offering circulars for the 11 securities each included an extraordinary 5,000 to 8,000 words of warnings regarding conflicts of interest.

119.     In many cases, including, but not limited to, Madison Park, Emporia, Libertas and Taberna, the Issuers purchased "collateral debt obligations" from previously issued CDOs or Structured Investment Vehicles *managed by the same investment managers*. Emporia, Libertas and Taberna were all managed by the Cohen brothers, who it has been alleged used successive CDOs to purchase securities from previously issued CDOs in a Ponzi-like fashion. In other words, the Cohen brothers would "bail out" an existing CDO by purchasing some of its most toxic securities with a new CDO.

120.     Taberna's fate is described in the following article, Fitch: "RAS's Toxic Taberna CDOs Getting Even More Toxic: Taberna To Take Yet Another Hit? Maybe, But The Bad News in This Brew is Already Baked In":

Man, what I wouldn't give to be a fly on the wall at dinner time in the Cohen house. Betsy and her husband, whom I shall refer to as Laius for purposes of these frivolous first two paragraphs, were a pretty conservative couple in the City of Brotherly Love. They were content to sally forth up and down the Schuykill, closing bread and butter 80/20 real estate deals. But Daniel's Ophelia drove him into a megalomaniacal oedipus complex, and boy did it make him crazy, that Daniel. I'm just not sure if he was simply crazy, or crazy like a fox.

He founded the eponymous bank, Cohen Brothers, then started Taberna Capital, which subsequently became Taberna Realty Finance Trust, a publicly traded REIT. After three years of furiously issuing CDOs for the Cohen menagerie (RAS, Taberna, yet to be born AFN, etc.), Ophelia-crazy Daniel hired Chris Ricciardi from Merrill Lynch in 2006 (the latter day dark star CDO genius). Ricciardi was a Managing Director in Merrill's Global Structured Credit Group, and it was he and Merrill Lynch that had grown wealthy structuring, pricing and selling hundreds of billions in ultimately toxic CDOs, using Cohen Brothers to manage many of them. This also made crazy Daniel quite wealthy along the way.

I hope he didn't put it all in one account at IndyMac.

Then, at the height of the bubble in 2006, the two of them cooked up an evil brew with Taberna Realty Finance as one of the main ingredients. They merged Taberna with RAS, ultimately saddling RAS with Taberna's acidic CDO equity.

Do you think they knew something we public shareholders didn't?

Taberna, which is now a rusted hulk of itself a mere two years later, continues to haunt the duo.

Assuming they have a conscience.

And undoubtedly, Betsy and Laius got the last word, or so it would seem. Unfortunately, RAS shareholders are left with the residue, after paying a 2006 premium for it.

Speculation and frivolity aside, Fitch announced last week that is had placed thirty-one classes from six Taberna collateralized debt obligations on "Rating Watch Negative". Four of the transactions — Taberna Preferred Funding II, II, IV, and V — are static CDOs, and the other two — Taberna Preferred Funding VI and VII — are managed CDOs.

The ratings action seems reasonable — maybe even overdue — given that the majority of the transactions are supported by portfolios of trust preferred securities issued to local and regional banks (see "The Trouble With TruPs"). The rest of the portfolio consists of subordinated debt issued by subsidiaries of real estate investment trusts, real estate operating companies,

homebuilders, and specialty finance companies, as well as commercial mortgage-backed securities and, in a very few cases, senior debt securities or commercial real estate loans.

Fitch attributed its rating actions to "heightened concern related to continued negative portfolio credit migration, as well as additional default activity."[5]

121.    However, the three Cohen CDOs were not the only ones containing these Ponzi-like features. Instead, most all of them did. However it is impossible to know to what extent any of the securities in fact operated as part of larger Ponzi schemes because they never disclosed their holdings and indeed — by virtue of the language of their offering circulars — were not required to do so. For example, the Madison Park offering memorandum plainly states:

A limited number of Collateral Obligations may be acquired following the Closing Date by the Issuer from other portfolios advised by the Investment Manager. . . .

122.    Another major conflict of interest was created by the purchase of loans as collateral from the underwriter (or "Placement Agent") and the Investment Manager. Again using Madison Park Ltd IV as an example, both the Investment Manager (Credit Suisse) and the underwriter (Goldman Sachs or "GS&Co.") used Madison Park Ltd IV as an opportunity to move below investment-grade loans off of their balance sheets.

123.    As the offering memorandum states with respect to Credit Suisse, the Investment Manager of Madison Park Ltd IV:

The Investment Manager and its Affiliates may at certain times be simultaneously seeking to purchase or sell investments from or to the Issuer as principal.

124.    With respect to Goldman Sachs, the underwriter or "Placement Agent" for Madison Park Ltd IV, the offering memorandum states:

---

[5] Fitch: "RAS's Toxic Taberna CDOs Getting Even More Toxic, REIT WRECKS," July 22, 2008. *Available at* http://reitwrecks.com/2008/07/fitch-rass-toxic-taberna-cdos-getting.html.

> The Investment Manager made arrangements (each such arrangement, a "Collateral Accumulation Agreement") with entities including, but which may not be limited to, GS&Co. Entities (the "Pre-Closing Parties") pursuant to which each Pre-Closing Party made a loan to the Issuer to finance the purchase by the Issuer of Collateral Obligations that are bonds, or purchased from the Issuer a 100% participation interest in Collateral Obligations that are loans simultaneously with the acquisition of such loans by the Issuer, in each case prior to the Closing Date. The Issuer will on or after the Closing Date repay loans with respect to the warehoused bonds and terminate the outstanding loan participations through a repurchase, subject to meeting eligibility criteria set forth in the Indenture, with proceeds from the offering of the Notes.

In other words, Goldman Sachs and Credit Suisse had previously been retained by below-investment-grade companies to act as their bankers and directly or indirectly to provide them with financing. Goldman Sachs and Credit Suisse had done so – in the form of loans, swaps, high-yield bond offerings, etc. — earning multiple layers of fees, finance charges, commissions, carry and interest in the process. And now Credit Suisse and Goldman Sachs needed to offload whatever exposure was left on their balance sheets as a result of the investment banking or underwriting services that they had provided to these below-investment-grade companies. Madison Park Ltd IV is the vehicle that they use to offload those exposures. Even more ironic, they managed to structure it in a manner that allowed Goldman Sachs and Credit Suisse to secure multiple layers of fees, commissions, interest and carry from the investors in Madison Park in return for saddling those investors with toxic loans.

125.    Other parts of the offering memorandum for Madison Park Ltd IV also disclose that the Collateral will contain precisely such "offloaded" exposures — as well as one-sided synthetic securities in which Credit Suisse and Goldman Sachs will be the counterparties:

> Credit Suisse or its Affiliates may own positions in and **will likely have placed or underwritten** certain of the Collateral Obligations (or other obligations of the issuers of Collateral Obligations) **when they were originally issued and may have provided or be providing investment banking services and other services to issuers of certain Collateral Obligations.** It is expected that from time to time the Investment Manager will purchase from or sell Collateral Obligations through or to Credit Suisse

44

or its Affiliates (including a **significant portion** of the Collateral Obligations to be purchased on or prior to the Closing Date) and that one or more Affiliates of Credit Suisse may act as counterparty ***with respect to all or a portion of the Synthetic Securities***, the selling institution with respect to Participations, a counterparty under a Hedge Agreement and/or a counterparty with respect to securities lending transactions (if any). Credit Suisse and its Affiliates may act as placement agent and/or initial purchaser in other transactions involving issues of collateralized debt obligations or other investment funds with assets similar to those of the Issuer . . . .

From time to time, the Investment Manager on behalf of the Issuer may purchase or sell Collateral Obligations through GS&Co. and/or any of its Affiliates (collectively, "GS&Co. Entities"). The Issuer may invest in the securities of companies affiliated with the GS&Co. Entities or in which the GS&Co. Entities have an equity or participation interest. The purchase, holding and sale of such investments by the Issuer may enhance the profitability of the GS&Co. Entities' own investments in such companies. In addition, it is expected that a GS&Co. Entity may also act as counterparty with respect to one or more Synthetic Securities or Securities Lending Agreements and may act as Hedge Counterparty with respect to one or more Hedge Agreements. In connection with the resale of the Securities, a GS&Co. Entity expects to enter into one or more hedging arrangements relating to a portion of the Securities. Such hedging arrangements will be entered into by such GS&Co. Entity with one or more purchasers of the Securities or with one or more counterparties to such GS&Co. Entity.

126.     Disclosures such as the foregoing — which are made in a similar fashion in the

offering memoranda for all 11 securities — mean that the securities were issued partially or wholly

for the purpose of purchasing toxic or questionable loans from the sponsoring investment banks,

and that the sponsoring investment banks will assume the role of "counterparties" in various

derivative securities, counterparties that other sections of the offering memoranda warn will be in an

advantageous position relative to the Issuers. In other words, the memoranda disclosed that the

Investment Manager (e.g., Credit Suisse Alternative Capital) will be using its control over the Issuer

to direct the Issuer (e.g., Madison Park Ltd IV) to enter into Synthetic Security arrangements with

the parent company of the Investment Manager (e.g., Credit Suisse) that will place Credit Suisse in

an advantageous position relative to Madison Park Ltd IV. Ditto the underwriter, Goldman Sachs.

127.     The circulars also generally warn as follows, as the offering memorandum of Madison Park Ltd IV does here:

> The Investment Manager will receive Senior Investment Management Fees and Subordinate Investment Management Fees, which may create incentives for it to make decisions that conflict with the interests of the holders of the Notes.

128.     The other conflicted purpose of the securities was to provide ongoing brokerage commissions, investment banking fees, financing fees, interest and other forms of revenue to the sponsoring investment banks, as also disclosed in additional conflicts language.

129.     There are numerous further conflicts of interest included in each of the 11 securities detailed in the voluminous warnings regarding conflicts published in each of the offering circulars. Further enumeration of these conflicts would be unproductive, as the intense conflicts already mention suffice to establish the bizarre nature of these securities.

130.     Suffice it to mention a final striking disclosure — made in most of the offering memoranda — that the conflicts of interest contained in the structure of these 11 securities were so intense that investors should be aware that some of the loans comprising the collateral might well be subject to claims of equitable subordination by the borrowers themselves.

131.     For example, here is the language on this subject of equitable subordination in the Madison Park Ltd IV document:

**Lender Liability Considerations and Equitable Subordination.**

A number of judicial decisions in the United States and some foreign jurisdictions have upheld the right of borrowers to sue lending institutions and others on the basis of various evolving legal theories. Generally, lender liability is founded upon the premise that a lender has violated a duty (whether implied or contractual) of good faith and fair dealing owed to the borrower or has assumed a degree of control over the borrower that creates a fiduciary duty owed to the borrower or its other creditors or shareholders.

In some cases, courts have subordinated the claim of a lender against a borrower to claims of other creditors of the borrower when the lending institution is found to have engaged in unfair, inequitable or fraudulent

conduct. Because of the nature of certain of the Collateral Obligations, the Issuer could be subject to claims from creditors of a Collateral Obligation issuer that the Issuer's claim under the Collateral Obligation should be equitably subordinated.

132. All of the securities subjected Mashreq to tremendous levels of implicit and explicit leverage.

133. Turning once again to the language for Madison Park as an example:

The Issuer will utilize a high degree of investment leverage. The use of leverage is a speculative investment technique which increases the risk to holders of the Notes. . . . The Collateral is expected to consist of below investment grade debt obligations. Such obligations have greater liquidity risk and credit risk than investment grade debt obligations.

134. Some of the securities did not specify or appoint an independent auditor or accountant. For example, the Madison Park offering memorandum astonishingly does not mention the appointment or involvement of any independent accountant or auditor whatsoever! To repeat, no aspect of the operations of investments of Madison Park IV was subject to the review — or even involvement — of an outside accountant.

135. Other securities, such as Emporia, promise only that an independent accountant "of international reputation" will be appointed eventually, without naming the firm. This is of course highly suspect and unusual in such a context, as it leaves the door open for the managers quietly to appoint a "friendly" accounting firm after the money has been raised. Specifically, the Emporia offering circular states:

The Issuer will appoint a firm of independent accountants of international reputation that will periodically perform certain procedures with respect to the Collateral Debt Obligations in the Collateral and confirm compliance with the Collateral Coverage Tests, the Collateral Quality Tests and the Portfolio Percentage Limitations, in each case, as required by the Indenture.

136. These failures to appoint a reputable accounting firm or auditor prior to the issuance of particularly conflicted, questionable and non-transparent securities — securities that cry out for the services of a diligent an objective auditor — would be tremendous red flags to any reasonable

investor. Especially when viewed in combination with the other questionable features of these securities — such as the fact that they were unregistered, fee-laden blind pools of below-investment-grade loans rife with conflicts of interest — these failures to appoint any third-party accounting or oversight whatsoever would indeed have caused most reasonable investors to burst out laughing.

137.    The securities — despite all of the above risks and conflicts — were also laden with overlapping layers of large outright fees.

138.    The first layer of fees, taken off the top, was for placement fees and organization expenses, which was generally approximately 5% of the money raised. To take Madison Park Ltd IV as an example, the total proceeds from the issuance of Classes A-1a, A-1b, A-2, B, C, D, E, Y and Z of Madison Park Ltd IV were $513 million. Off the top, $23.4 million was paid out for "certain fees, organizational and other fees and expenses." No detailed disclosure regarding these fees and expenses is provided. If ING or any of its other divisions received any of the fees, this would obviously imply a major conflict of interest.

139.    The remaining Net Proceeds are used to purchase collateral — that is, loans from the sponsoring investment banks that are already collecting multiple layers of direct fees from in their roles as placement agents or investment managers. The Net Proceeds are also used to purchase "synthetic securities" and "hedge agreements," again from the sponsoring investment banks in arrangements that different parts of the disclosure documents warn may well be asymmetrically beneficial to the investment banks. In the case of Madison Park Ltd IV, the Net Proceeds totaled $489.6 million.

140.    The so-called Pre-Closing Parties that "accumulated" loans on behalf of the Issuer prior to closing are paid additional fees in return for "financing" the Issuers' pre-closing acquisition of loans. In reality, of course, the Pre-Closing Parties are offloading toxic loans that they want to move off of their balance sheets and onto that of the Issuers, so if anything they should be paying a

fee to the Issuers. Nevertheless, these securities are structured so as to pay fees to the Pre-Closing

Parties in return for allowing them to transfer — at their earliest possible opportunity — risk off of

their balance sheets and onto the backs of the investors in the Issuers.

141.    In the case of Madison Park Ltd IV, the principal Pre-Closing Parties were Goldman

Sachs, which was also the underwriter and placement agent of the deal, and Credit Suisse, which

acted as Investment Manager. Here is the relevant language from the offering memorandum:

**Pre-Closing Collateral Accumulation.**

The Investment Manager made arrangements (each such arrangement, a
"Collateral Accumulation Agreement") with entities including, but which
may not be limited to, GS&Co. Entities (the "Pre-Closing Parties") pursuant
to which each Pre-Closing Party made a loan to the Issuer to finance the
purchase by the Issuer of Collateral Obligations that are bonds, or purchased
from the Issuer a 100% participation interest in Collateral Obligations that
are loans simultaneously with the acquisition of such loans by the Issuer, in
each case prior to the Closing Date. The Issuer will on or after the Closing
Date repay loans with respect to the warehoused bonds and terminate the
outstanding loan participations through a repurchase, subject to meeting
eligibility criteria set forth in the Indenture, with proceeds from the offering
of the Notes. Under the Investment Management Agreement, any such
transactions in which the Investment Manager or an Affiliate thereof is
acting as principal must be disclosed to and receive the consent of the
Conflicts Review Board prior to the completion of such transaction (or, in
the case of any Collateral Obligations acquired prior to the Closing Date,
prior to the completion of the transfer thereof to the Issuer on the Closing
Date) by the Issuer or the Investment Manager on the Issuer's behalf. The
Pre-Closing Parties have financed the acquisition of Collateral Obligations
identified by the Investment Manager during the period prior to the Closing
Date. Each such participation will be terminated by the Issuer on the Closing
Date at the price at which the relevant Pre-Closing Party purchased such
participation plus any additional accrued and unpaid interest thereon, which
price may be higher or lower than the prevailing market price of the related
Collateral Obligation as of the Closing Date.

In consideration for providing financing for the acquisition of the Collateral
Obligations, each Pre-Closing Party is entitled to a specified funding cost (the
"Funding Cost") and is entitled to a portion of the Net Carry, if positive. The
"Net Carry" with respect to each Collateral Accumulation Agreement will
equal (x) all interest, fees and commissions paid by the obligors under the
Collateral Obligations financed under such Collateral Accumulation
Agreement or accrued on such Collateral Obligations purchased by the
related Pre-Closing Party, from the time each such Collateral Obligation is

purchased through the Closing Date, minus (y) the Funding Cost payable to such Pre-Closing Party, plus (or minus) (z) any net gains (or net losses) realized in connection with the disposition of obligations purchased by the Issuer with financing from the related Pre-Closing Party but which are not included in the Collateral for any reason.

It is currently expected that approximately 95% or more of the aggregate principal amount of the Collateral Obligations expected to be owned by the Issuer as of the Effective Date will be identified by the Investment Manager and financed (or committed to be financed) by the Pre-Closing Parties under the arrangements set forth above as of the Closing Date.

142.    A third layer of fees secured by investment bank sponsors of these securities was commissions and fees for brokerage and investment banking services for the issuers. The most lucrative of these were fees were for what the offering documents generally describe as synthetic securities or hedging. The amounts earned by investment banks for such products — particularly when they create them as custom products in which they act as the counterparty — dwarfs the amount they might make as a commission for trading a normal stock or bond.

143.    Finally, there are the investment management fees themselves, which include both a fixed percentage (generally 0.3% to 0.5% of the assets under management as well as up to 20% of the returns). In other words, many of these CDOs/CLOs were charging a hedge-fund-type incentive fee structure on top of all of the other layers of commissions, fees and other benefits — such as being able to off-load thousands of sub-investment-grade loans from their balance sheets — that these securities created for their sponsors.

**DEFENDANTS' MISREPRESENTATIONS IN THE REVISED 2007 MANDATE**

144.    In light of the tremendous concentration of the portfolio and the nature of the 11 toxic illiquid securities in question, and returning now to the plain language of the Revised 2007 Mandate, defendants' investment of $73 million of Mashreq's $108 million portfolio in the "illiquid securities," it becomes clear that there is no way to reconcile the language of the Revised 2007 Mandate — which ING used to lull Mashreq into leaving its funds in ING's care — and ING's

subsequent investment conduct. Clearly, ING never intended to comply with the Revised 2007 Mandate. And clearly, the process of clarifying, refining, agreeing upon and executing the document was nothing more than a charade. Indeed ING violated the Revised 2007 Mandate in at least seven specific ways, including:

a.      These toxic illiquid securities were below the letter and spirit of the credit-quality standards established in guideline 2, "Credit Quality." Specifically, guideline 2 required that all portfolio securities be investment grade, whereas the loans that comprised the collateral that constituted the sole assets of various shell companies that issued the toxic illiquid securities were universally below investment grade.

b.      The toxic illiquid securities were not permitted pursuant to guideline 4, "Permitted Securities." CDOs, CLOs and CBOs are nowhere mentioned in the long list of permitted securities. Moreover, the list of permitted securities is an exhaustive detailed list that contains — in many cases redundantly — all securities allowed in the portfolio, e.g., "repurchase agreements (including tri-party agreements), reverse repurchase agreements, MBS dollar rolls, fixed income futures, options, swaps and derivatives." In addition, the Revised 2007 Mandate deletes the words, "other structured notes" from the list of Permitted Securities, thereby deleting the only *possible* reference — however oblique and indirect — to CDOs/CLOs/CBOs.

c.      The toxic illiquid securities were affirmatively prohibited pursuant to guideline 5, "Prohibited Investments." Specifically, the revised Mandate *adds* "subordinated bank debt" to the list of Prohibited Securities. The shell companies that issued the CDOs/CLOs/CBOs acted like banks that made low-quality loans on a levered basis. Some, such as Sigma Finance, acted even more like banks by making, on a levered basis, long-dated, lower-quality loans by issuing short-dated, higher-quality debt in the commercial paper markets. The toxic illiquid securities were subordinated debt in these *de facto* banks. It is difficult, if not impossible, to reconcile the purchases

51

of the toxic illiquid securities in question with a new prohibition against investments in subordinated bank debt.

d.     The toxic illiquid securities exceeded the "Exposure Limits" established in guideline 6. Or, to be more precise, the 70% position in CDOs/CLOs exceeded the exposure limit established for each and every type of permitted security. The Revised 2007 Mandate does not include an exposure limit for CDOs/CLOs because they were not permitted securities. Meanwhile, the position in the toxic illiquid securities exceeded every other exposure limit. For example, the two largest exposure limits are for corporate bonds and MBS. The Revised 2007 Mandate's exposure limit for corporate bonds is 50% of the portfolio; for MBS, the limit is also 50%. For A-rated MBS—the closest analogue of the toxic illiquid securities mentioned in guideline 6 — the exposure limit is 15%. Thus, the 70% position in CDOs/CLOs significantly exceeded all stated exposure limits and was *four times* the exposure limit for their closest analogue.

e.     Defendants not only fell short — by over 4,000 basis points — of the agreed "Performance Benchmark" of three-month LIBOR plus 0.50% established in guideline 7, they also created a tremendously risky and illiquid portfolio that created massive losses and that was wholly inconsistent with such a benchmark. Moreover this LIBOR + .50% benchmark in the Revised 2007 Mandate is lower than the corresponding LIBOR + .75% in the Original 2005 Mandate. This decrease belies any contention that the Revised 2007 Mandate reflected a decision to assume a higher level of risk.

f.     Defendants thoroughly violated the monitoring and notification responsibilities set out in guideline 8, "Value at Risk," which required ING to monitor portfolio volatility and provide daily VaR on a monthly basis or notify Mashreq in the event that the daily marked to market valuation declines by more than 1%. For example, given that the portfolio was experienced losses of up to 50% during the period in question, it goes without saying that

defendants' duty to notify Mashreq that the portfolio had experienced a decline of more than 1%
must have been triggered at least several dozen times. Mashreq never received a single such
notification from ING.

g.      ING undertook no hedging, shorting or other risk-minimization strategies, as
implied by guidelines 9–12, leaving Mashreq fully exposed to the tremendous risks created by the
defendants' remaining wholesale violations of the Investment Guidelines.

## DEFENDANTS' ADDITIONAL FRAUDULENT ACTS

145.    ING has engaged in additional fraud related to these events. Specifically, it appears
that ING cooks the composite results that it uses to market its Intermediate Fixed Income Managed
Accounts to the present day. By engaging in these additional misrepresentations, ING is able to
protect its track record from the disastrous effects of its malfeasance in accounts such as Mashreq's.

146.    For convenience, here reproduced is the historical composite performance claimed
by ING for its ING Intermediate Fixed Income Separately Managed Accounts in its most recent
"Strategy Brief" or brochure (Exhibit 3):

| Year | Net Returns |
|------|-------------|
| 2011 | 3.10% |
| 2010 | 3.48% |
| 2009 | 2.63% |
| 2008 | 3.44% |
| 2007 | 6.09% |
| 2006 | 3.08% |
| 2005 | 1.19% |
| 2004 | 1.82% |
| 2003 | 2.80% |
| 2002 | 9.91% |

147.    As recounted herein, in 2007 the net returns on Mashreq's portfolio was not a gain of 6% as noted above, but instead a loss of well over 50%. If any other ING clients had an experience similar to Mashreq's, the 6% composite return for 2007 seems dubious at best.

148.    But according to the fine print for the above-performance record, certain accounts were excluded from the composite:

> Firm Definition: ING U.S. Investment Management (the "Firm") is defined as all discretionary accounts managed by ING U.S. Investment Management and its subsidiary ING Investment Trust Co., **but not including collateralized debt obligation structures**, **long/short hedge funds, structured mortgage derivative portfolios**, or specialized accounts supporting the reinsurance arrangements of affiliated insurance companies.

*See* Ex. 3. The foregoing is a cunning attempt to comply with the letter (if not the spirit) of Rule 206(4)-1(a)(5) of the Investment Advisers Act of 1940, which, according to the Staff of the SEC, prohibits performance advertisement that

> [f]ails to disclose prominently, if applicable, that the results portrayed relate only to a select group of the adviser's clients, the basis on which the selection was made, and the effect of this practice on the results portrayed, if material.

*Available at* http://www.sec.gov/divisions/investment/noaction/clovercapital102886.htm. Hence, ING currently portrays the results of its ING Intermediate Fixed Income Separately Managed Accounts based only on a very select group of its clients while disclosing (far from prominently or clearly, one might add) that certain exceptional "structures" were excluded from the composite results, including "collateralized debt obligation structures, long/short hedge funds, structured mortgage derivative portfolios, or specialized accounts supporting the reinsurance arrangements of affiliated insurance companies." In other words, ING has now recategorized Mashreq's account as a "collateralized debt obligation structure" as opposed to a "normal" ING Intermediate Fixed Income Account so that it can drop it from its composite performance results.

149.    However, the only way that ING could justify dropping Mashreq's account from its composite results would be to claim that it was indeed governed by an exceptional mandate, a

"collateralized debt obligation structure." The problem for ING is that this knife cuts both ways: if the structure — the mandate — of Mashreq's account was so ***exceptional*** that it warranted exclusion from ING's composite results, should there have not been at least some indication of this "exceptionalism" in the mandate itself? Instead the words, "collateralized debt obligation," never appeared in the Revised 2007 Mandate and were indeed prohibited by same.[6] Meanwhile Mashreq told ING — clearly and emphatically — that it never wanted to have any collateralized debt obligations in its portfolio.

150. Meanwhile ING's ***own*** explanation in its e-mail of September 16, 2007 regarding how CDOs were permitted under the Revised 2007 Mandate is as follows:

> With the deletion of the prohibition on embedded leverage, express reference to CDOs as permitted investments would have been redundant. Your reference to subordinated debt as a newly permitted asset type illustrates this point because there is no express reference in the Feb-'07 guidelines to subordinated debt being permitted securities. Rather, non-bank subordinated debt is permitted because it is a type of permitted security (in this case, corporate debt) that is not otherwise prohibited. Listing non-bank subordinated debt as a permitted security would have been redundant. Similarly, CDOs are permitted because they are a type of permitted security (ABS) that is not otherwise prohibited.

151. Does this sound like a description referencing an exceptional "collateralized debt obligation structure"? Are we meant to believe that the mandate for a "collateralized debt obligation structure" — that ING later claimed was so exceptional that it was not even to be included in ING's composite results — nowhere even ***contains*** the term "collateralized debt obligation" or CDO? Are we to believe that ING honestly expected Mashreq to ***deduce*** the account's new status as an exceptional "collateralized debt obligation structure"?

---

[6] Defendants misrepresented to Mashreq as well as other investors various information concerning the ING Intermediate Fixed Income Fund's investment performance, longevity, assets, and other similar metrics, as well as whether the Mashreq account or other accounts were later exempted by ING from its composite returns.

152.    The answer to these questions is obvious. The Revised 2007 Mandate did not describe a "collateralized debt obligation structure." ING never expected Mashreq to deduce anything. ING's September 16, 2007 e-mail was simply a laughable attempt to con its way out of being caught in a lie. And the subsequent deletion of Mashreq's results from ING's composite results is simply an additional lie that simultaneously proves — because it is an admission that ING's investment conduct in Mashreq's account was recklessly extreme — both sets of ING's previous lies, specifically the Revised 2007 Mandate and then ING's lies from July through December 2007. Those are the facts in a nutshell: lies, more lies, and then another lie that proves the lies.

## DAMAGES

153.    After mitigating the losses in the toxic illiquid securities by holding them until the second quarter of 2010, when markets had revived somewhat and Mashreq, and then seeking bids for each of the 11 securities, Mashreq was left with the following losses from defendants' conduct:

| Security | Amount originally invested (in $) | Sale proceeds (in $) | Dollar amount lost (in $) |
|---|---|---|---|
| Commercial Industrial Finance | 5,005,000 | 3,100,000 | 1,905,000 |
| Emporia Preferred Funding | 5,018,750 | 2,925,000 | 2,093,750 |
| Fraser Sullivan CLO Ltd | 2,937,000 | 2,100,000 | 837,000 |
| Galena CDO Ltd | 10,100,000 | 5,800,000 | 4,300,000 |
| Harch CLO Ltd | 4,941,260 | 3,587,500 | 1,353,760 |
| Libertas Preferred Funding Ltd | 4,923,415 | 0 | 4,923,415 |
| Liberty Harbour CDO Ltd | 10,075,000 | 460,000 | 9,615,000 |
| Madison Park Funding Ltd | 10,000,000 | 6,480,000 | 3,520,000 |
| Octagon Investment Partners XI | 4,942,100 | 3,600,000 | 1,342,100 |
| Sigma Finance Corp | 10,000,000 | 0 | 10,000,000 |
| Taberna Preferred Funding Ltd | 4,765,308 | 1,031,578 | 3,733,730 |
| **TOTAL** | **$72,707,833** | **$29,084,078** | **$43,623,755** |

## COUNTS

### Count I
### Breach of Contract
### Against ING Groep and IIM

154.   Plaintiff restates and incorporates the allegations contained in each paragraph above as though fully set forth herein.

155.   Plaintiff had a contract with ING, the Revised 2007 Mandate, to invest its funds in a conservative ING Intermediate Fixed Income Separately Managed Account according to plaintiff's conservative investment guidelines for such an account.

156.   Plaintiff performed all its obligations under the contract.

157.   Defendants materially breached this contract with plaintiff in numerous ways, including, without limitation: (i) failing to invest the plaintiff's funds in securities that met the letter and spirit of guideline 2 on "Credit Quality" that required that all portfolio securities be investment grade and liquid, whereas the loans that comprised the collateral that constituted the sole assets of various shell companies that issued the toxic illiquid securities were universally below investment grade; (ii) Violating guideline 4, "Permitted Securities" by purchasing CDOs, CLOs, and CBOs which are nowhere mentioned in the long list of permitted securities; (iii) violating guideline 5, "Prohibited Investments" by purchasing the 11 toxic illiquid securities that were expressly prohibited under "subordinated bank debt" as detailed above; (iv) violating the "Exposure Limits" established in guideline 6. Or, to be more precise, the 70% position in CDOs/CLOs exceeded the exposure limit established for each and every type of permitted security. Further, the Mandate does not include an exposure limit for CDOs/CLOs because they were not permitted securities; (v) failing to meet — by over 4,000 basis points —the agreed "Performance Benchmark" of three-month LIBOR plus 0.50% established in guideline 7; (vi) violating the monitoring and notification responsibilities set out in guideline 8, "Value at Risk," which required ING to monitor portfolio

volatility and provide daily VaR on a monthly basis or notify Mashreq in the event that the daily marked to market valuation declined by more than 1%. Since the portfolio experienced losses of up to 50% during the relevant period, defendants had a duty to notify Mashreq that the portfolio had experienced a decline of more than 1%, but failed to do so; and (vii) ING undertook no hedging, shorting or other risk-minimization strategies, identified in guidelines 9–12, leaving Mashreq fully exposed to the tremendous risks created by the defendants' remaining wholesale violations of the Investment Guidelines.

158.    Defendants knew, or reasonably should have known, that the investments were unsafe, risky, and/or illiquid, yet defendants failed to adhere to liquidity requirements in making purchases of plaintiff's investments, as detailed above. Defendants' breach is further compounded by their fraudulent concealment of their misconduct from plaintiff demonstrating that defendants were acting in bad faith, with willful misconduct, fraud and/or reckless disregard of their duties to their client.

159.    Plaintiff suffered damages and is entitled, among other things, to recover its damages plus interest thereon.

**Count II**
**Breach of Fiduciary Duty**
**Against ING Groep and IIM**

160.    Plaintiff restates and incorporates the allegations contained in each paragraph above as though fully set forth herein.

161.    By entering into the IMA, defendants undertook to act as an agent and fiduciary for the plaintiff in agreeing to invest plaintiff's money in a reasonable and prudent manner and according to Mashreq's wishes and objectives for its investment.

162.     Defendants owed Mashreq the utmost fiduciary duties of due care, good faith, candor and loyalty. They had a duty to communicate honestly with plaintiff and to safeguard and protect the Mashreq's assets.

163.     Mashreq reasonably relied on this fiduciary relationship and defendants' unique and special expertise in investing with them.

164.     Because of the fiduciary duty owed to plaintiff, defendants were required — contractually and by virtue of common law — to ensure that all investments made on plaintiff's account were consistent with the conservative investment guidelines established in the Revised 2007 Mandate for the portfolio, including: (i) investing in securities that met the credit quality outlined in the parties' Revised 2007 Mandate; (ii) not investing in CDOs, CLOs, CBOs or other similar securities; (iii) observing the exposure limits set for each type of security; (iv) investing in securities that would meet the Performance Benchmark; (v) continuously monitoring and notifying plaintiff of portfolio volatility and marked to market valuation declines; and (vi) generally undertaking all measures to ensure that such investments remained prudent throughout the period of the investments.

165.     Defendants were obligated to act solely in the interests of the plaintiff for the exclusive purpose of providing benefits to it, and with the care, skill, prudence and diligence that a prudent person acting in a like capacity would have in a similar situation.

166.     Defendants breached their fiduciary duties, including the duty to prudently and loyally manage plaintiff's assets. As described in detail herein, defendants failed to adequately protect the plaintiff from the inevitable losses that they knew or should have known would ensue, due to defendants' imprudent management of plaintiff's assets.

167.     Defendants breached the fiduciary duties it owed to the plaintiff, by *inter alia*: (a) imprudently investing investment funds received by the plaintiff in inappropriate and unsuitable

investments that violated the investment guidelines set out by plaintiff; (b) imprudently maintaining the investments in risky financial vehicles; (c) failing to properly monitor the investments, which if prudently done, would have revealed excessive risks in the investing strategy; (d) imprudently maintaining investments in risky financial vehicles after becoming aware of warnings concerning these types of investments; and (f) by otherwise disloyally placing defendants' own interests above the interests of plaintiff.

168.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, plaintiff sustained substantial losses. Accordingly, plaintiff seeks relief from defendants.

**Count III**
**Common Law Fraud**
**Against ING Groep, IIM and Kilbride**

169.    Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs, inclusive, as if fully set forth herein.

170.    Defendants made materially false and misleading affirmative representations and omissions to Mashreq in the Revised 2007 Mandate regarding the investment guidelines to which they would adhere, the types of securities in which they would invest, the types of securities in which they would not invest, and the degree to which they would concentrate Mashreq's portfolio in securities of a given type. But for these material misrepresentations and omissions, Mashreq would not have invested $108 million with ING pursuant to the Revised 2007 Mandate.

171.    Defendants also made a series of material misrepresentations and omissions regarding the contents of Mashreq's portfolio and the tremendous risks therein. None of these affirmative misrepresentations or omissions by defendants was remotely consistent with any reasonable understanding of the ING Intermediate Fixed Income Account product into which Mashreq was investing, any of the Mandates or Agreements entered into by ING and Mashreq over

the course of their relationship, or any of the oral statements and assurances made in meetings and communications between Mashreq and defendants.

172.     Defendants knew or recklessly disregarded the false and misleading nature of their representations and omissions. The bases for defendants' knowledge or reckless disregard are set forth with particularity above. Among other things, defendants' motive for lying in the Revised 2007 Mandate was the simple fact that if they did not lie, Mashreq would withdraw its funds. Defendants knew this (that Mashreq would withdraw its funds) based on Mashreq's emphatically stated conservative preferences which were expressed repeatedly by Mashreq during the Presentation and during the months of negotiations leading up to the execution of the Revised 2007 Mandate in February 2007.

173.     Mashreq justifiably relied on defendants' materially misleading statements and omissions as they went to the core of its decision regarding retaining ING's investment advisory services — namely, the attendant amount and nature of risk associated with the ING's services and the determination of whether the rates of return associated with the ING's services adequately compensated Mashreq for such risks. ING's services would have been unmarketable to Mashreq — or anyone else — but for ING's misleading statements and omissions concerning the nature of its investment process, the guidelines to which it falsely promised to adhere, and the lulling lies and assurances that ING made to Mashreq throughout the relationship.

174.     ING's materially misleading statements and omissions proximately caused Mashreq to lose approximately $43 million. As a direct and proximate result of defendants' materially misleading statements and omissions, Mashreq would instead (1) still be in possession of the $43 million plus interest accrued thereon since 2008 and (2) have earned approximately $18 million on its portfolio had it been invested in the ING Intermediate Fixed Income Account product into

which it invested and that ING to this day claims earned an average of 15% for ING's clients during the period in question, as well as additional damages and penalties to be determined at trial.

### PRAYER FOR RELIEF

**WHEREFORE**, plaintiff respectfully requests for relief and prays that the Court enter judgment in plaintiff's favor as follows:

      A.    An Order compelling defendants to make good to plaintiff all losses suffered by plaintiff as the result of defendants' breaches of contract and fraudulent conduct; including losses to plaintiff resulting from defendants' imprudent, improper and prohibited investment of the assets of the plaintiff, and to restore to the plaintiff all profits it would have made if defendants had fulfilled their contractual obligations;

      B.    Actual damages in the amount of any losses plaintiff has suffered;

      C.    Punitive damages for defendants' intentional, willful and malicious misconduct;

      D.    An Order awarding costs and interests;

      E.    Ordering that defendants be required to pay pre- and post-judgment interest on all such sums;

      F.    An Order awarding attorneys' fees and interest; and

      G.    Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury with respect to any claims so triable.

DATED: April 8, 2013

_Azra Mehdi_

Azra Z. Mehdi (AM-9719)
THE MEHDI FIRM
One Market
Spear Tower, Suite 3600
San Francisco, CA 94105
(415) 293-8039
(415) 293-8001 (fax)
azram@themehdifirm.com

347 5th Avenue, Suite 1402
New York, NY 10016

Attorney for Plaintiff

63