UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MASHREQBANK, PSC,

                       Plaintiff,

ING GROEP N.V., ING INVESTMENT
MANAGEMENT COMPANY a/k/a ING
INVESTMENT MANAGEMENT U.S., ING
MANAGED ACCOUNT GROUP or ING
INVESTMENT MANAGEMENT AMERICAS,
RICHARD KILBRIDE, and DOES 1-10
inclusive,

                       Defendants.

No. 1:13-cv-2318-LGS

ECF Case

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

THE MEHDI FIRM
One Market
Spear Tower, Suite 3600
San Francisco, CA 94105
(415) 293-8039
            -and-
347 5th Avenue, Suite 1402
New York, NY 10016

**Table of Contents**

I.      Introduction ................................................................................................................. ii

II.     Relevant Factual Background .................................................................................... 3

III.    Applicable Legal Standard ........................................................................................ 4

IV.     The Complaint Adequately Alleges a Claim For Breach of Contract. ...................... 4

        A.      ING's Factual Arguments Regarding Breaches of Specific Provisions Raise Disputed Issues of Contract Interpretation. ...................................................... 6

        B.      Mashreq's Breach of Contract Claim Is Timely. ......................................... 10

        C.      ING's Attempt to Use Extrinsic Evidence to Defeat Mashreq's Claims Must Fail. .............. 12

V.      Mashreq's Breach of Fiduciary Duty and Fraud Claims Are Timely, Adequately Pled and Not

        Duplicative. ............................................................................................................. 15

        A.      New York's "borrowing statute," N.Y. C.P.L.R. Section 202, Is Inapplicable ......................... 15

        B.      Even if N.Y. C.P.L.R. Section 202 Applied, Ian Edge Is Wrong and New York Has the Shorter Statute. .............. 16

        C.      The Applicable New York Statute of Limitations for Mashreq's Fraud and Breach of Fiduciary Duty Claims Is Six Years .............. 17

        D.      Mashreq's Fraud, Breach of Contract and Breach of Fiduciary Duty Claims Are Each Based on Unique Factual Allegations .............. 18

VI.     Mashreq's Fraud Claim Is Timely, Non-Duplicative and States a Claim for Relief............................. 20

VII.    Questions Regarding Damages Are Premature. ...................................................... 24

VI.     Conclusion ............................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Fed. Group, Ltd. v. Rothenberg,*
  No. 91 Civ. 7860 (THK), 2003 WL 22349673 (S.D.N.Y. Oct. 14, 2003) ...................... 25

*Anderson Clayton & Co. v. Alanthus Corp.,*
  457 N.Y.S.2d 578 (2d Dep't 1983) ....................................................................................... 5

*Arbitron, Inc. v. 3 Cities, Inc.,*
  438 F. Supp.2d 216 (S.D.N.Y. 2006) ................................................................................... 14

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ........................................................................................................... 4, 5

*Assured Guar. Mun. Corp. v. UBS Real Estate Sec., Inc.,*
  No. 12-cv-1579, 2012 WL 3525613 (S.D.N.Y. Aug. 15, 2012) ........................................ 24

*Assured Guaranty (UK) Ltd. v. J.P. Morgan Investment Management, Inc.,*
  915 N.Y.S.2d 7 (1st Dep't 2010), *aff'd,* 962 N.E.2d 765 (N.Y. 2011) ................ 10, 11, 19

*Assured Guaranty (UK) Ltd. v. J.P. Morgan Investment Mgmt., Inc.,*
  No. 603755/08 ............................................................................................................... 11, 12

*Battery S.S. Corp. v. Refineria Panama, S.A.,*
  513 F.2d (2nd Cir. 1975) ....................................................................................................... 6

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ............................................................................................................... 2

*BNP Paribas Mortg. Corp. v. Bank of Am., N.A.,*
  778 F. Supp. 2d 375 (S.D.N.Y. 2011) ................................................................................... 4

*Broder v. MBNA Corp.,*
  722 N.Y.S.2d 524 (1st Dep't 2001) ..................................................................................... 23

*Brooks v. Key Trust Co. Nat'l Ass'n,*
  809 N.Y.S.2d 270 (3d Dep't 2006) ..................................................................................... 19

*Burkina Wear, Inc. v. Campagnolo, S.R.L.,*
  No. 07 Civ. 3610, 2008 WL 1007634 (S.D.N.Y. Apr. 8, 2008) ......................................... 24

*Cafferty v. Scotti Bros. Records,*
  969 F. Supp. 193 (S.D.N.Y. 1997) ...................................................................................... 15

*Coastal Aviation, Inc. v. Commander Aircraft Co.,*
  937 F. Supp. 1051 (S.D.N.Y. 1996), *aff'd,* 108 F.3d 1369 (2d Cir. 1997) ...................... 25

*Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*,
  631 F.3d 42 (2d Cir. 2011) ............................................................................................ 6

*Doe v. Montefiore Med. Ctr.*,
  No. 12 Civ. 686 (CM), 2012 WL 624688 (S.D.N.Y. Feb. 19, 2013) .............................. 24

*Eskimo Pie Corp. v. Whitelawn Dairies, Inc.*,
  284 F. Supp. 987 (S.D.N.Y. 1968) ................................................................................. 8

*Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co.*,
  375 F.3d 168 (3d Cir. 2004) ........................................................................................... 6

*Evangelista v. Ashcroft*,
  359 F.3d 145 (2d Cir. 2004) ........................................................................................... 5

*First Bank of the Americas v. Motor Car Funding, Inc.*,
  690 N.Y.S.2d 17 (1st Dep't 1999) ................................................................................. 21

*Foman v. Davis*,
  371 U.S. 178 (1962) ...................................................................................................... 25

*Garza v. Marine Transp. Lines, Inc.*,
  861 F.2d 23 (2d Cir. 1988) ............................................................................................. 6

*Gonzalez v. Hasty*,
  651 F.3d 318 (2d Cir. 2011) ......................................................................................... 10

*Gordon v. Bialystoker Ctr. & Bikur Cholim, Inc.*,
  45 N.Y.2d 692 (1978) ................................................................................................... 20

*Goshen v. Mutual Life Ins. Co.*,
  98 N.Y.2d 314 (2002) ................................................................................................... 12

*Greenfield v. Philles Records, Inc.*,
  98 N.Y.2d 562 (2002) ..................................................................................................... 6

*Guoba v. Sportsman Props., Inc.*,
  No. 03-CV-5039 (JS)(WDW), 2006 WL 2792753 (E.D.N.Y. Sept. 26, 2006) .............. 24

*Hadden v. Consol. Edison Co.*,
  312 N.E.2d 445 (N.Y. 1974) ........................................................................................... 5

*Harsco Corp. v. Segui*,
  91 F.3d 337 (2d Cir. 1996) ............................................................................................. 4

*Heyman v. Commerce & Indus. Ins. Co.*,
  524 F.2d 1317 (2nd Cir. 1975) ....................................................................................... 6

*Howell v. Freifeld*,
  631 F. Supp. 1222 (S.D.N.Y. 1986) ............................................................................. 19

*Huen N.Y., Inc. v. Bd. of Educ. Clinton Cent. Sch. Dist.*,
890 N.Y.S.2d 748 (4th Dep't 2009) .................................................................................... 7

*IDT Corp. v. Morgan Stanley Dean Witter & Co.*,
12 N.Y.3d 132 (2009) .................................................................................................... 17

*Insurance Co. of North America v. ABB Power Generation*,
925 F. Supp. 1053 (S.D.N.Y. 1996) ............................................................................ 15, 16

*Ironshore Ins., LTD v. Western Asset Mgmt. Co.*,
No. 11 Civ. 05954 (LTS)(JCF), 2012 WL 1981477 (S.D.N.Y. May 30, 2012) .................... 18

*Johnson v. Nextel Commc'ns, Inc.*,
660 F.3d 131 (2d Cir. 2011) ......................................................................................... 19

*Kaufman v. Cohen*,
760 N.Y.S.2d 157 (1st Dep't 2003) ............................................................................... 20

*Kenford Co. v. County of Erie*,
537 N.E.2d 176 (1989) ................................................................................................. 25

*Malmsteen v. Berdon LLP*,
369 F. App'x 248 (2d Cir. 2010) ................................................................................... 18

*Manolis v. Brecher*,
No. 11 Civ. 2750 (RMB)(HPB), 2012 WL 527450 (S.D.N.Y. Feb. 16, 2012) .................... 5

*Matrixx Initiatives, Inc. v. Siracusano*,
131 S. Ct. 1309 (2011) ................................................................................................. 24

*MBIA Ins. Co. v Countrywide Home Loans, Inc.*,
No. 602825108, 2009 WL 2135167 (N.Y. Sup. Ct. July 8, 2009) .................................... 21

*MBIA Ins. Corp. v. Credit Suisse Sec. (USA) LLC*,
927 N.Y.S.2d 517 (Sup. Ct. N.Y. Cnty. 2011), *rev'd on other grounds*, 102 A.D.3d 488 (1st Dep't 2013) ......... 5

*McKenna v. Wright*,
386 F.3d 432 (2d Cir. 2004) ......................................................................................... 14

*Mejia-Ricart v. Bear Stearns & Co.*,
No. 95 Civ. 582 (LLS), 1996 WL 94810 (S.D.N.Y. Mar. 1, 1996) .................................. 18

*Merrill Lynch & Co. v. Allegheny Energy, Inc.*,
500 F.3d 171 (2d Cir. 2007) ......................................................................................... 5

*Muller-Paisner v. TIAA*,
No. 12-3579-cv, 2013 WL 3064858 (2d Cir. June 20, 2013) ......................................... 19

*Pension Benefit Guaranty Corp. v. Morgan Stanley Investment Management*,
712 F.3d 705 (2d Cir. 2013) ....................................................................................... 9, 10

*Phoenix Light SF Ltd. v ACE Sec. Corp.*,
    39 Misc. 3d 1218(A) (N.Y. Sup. Ct. 2013) ........................................................................ 22

*Ronnen v. Ajax Elec. Motor Corp.*,
    671 N.E.2d 534 (N.Y. 1996) ............................................................................................... 9

*Rothenberg v. Lincoln Farm Camp, Inc.*,
    755 F.2d 1017 (2d Cir. 1985) ............................................................................................. 9

*Ruotolo v. City of New York*,
    514 F.3d 184 (2d Cir. 2008) ............................................................................................... 4

*Shilkoff, Inc. v. 885 Third Ave. Corp.*,
    750 N.Y.S.2d 53 (1st Dep't 2002) ...................................................................................... 5

*Small v. Lorillard Tobacco Co.*,
    94 N.Y.2d 43 (1999) ......................................................................................................... 20

*Staff v Lido Dunes, Inc.*,
    262 N.Y.S.2d 544 (1965) .................................................................................................. 10

*Stafford v. Int'l Harvester Co.*,
    668 F.2d 142 (2d Cir. 1981) ........................................................................................ 15, 16

*Stuart v. Am. Cyanamid Co.*,
    158 F.3d 622 (2d Cir. 1998) ............................................................................................. 10

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) .................................................................................................... 23, 24

*Towne v. Eisner*,
    245 U.S. 418 (1918) (Holmes, J.), *superseded on other grounds*, *Union P.R. Co. v. United States*, 524 F.2d 1343
    (1975) .................................................................................................................................. 8

*Trademark Research Corp. v. Maxwell Online, Inc.*,
    995 F.2d 326 (2d Cir. 1993) ............................................................................................. 25

*Walk-In Medical Ctrs., Inc. v. Breuer Capital Corp.*,
    818 F.2d 260 (2d Cir. 1987) ............................................................................................... 8

*Wilson v. Merrill Lynch & Co.*,
    671 F.3d 120 (2d Cir. 2011) (In deciding a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the
    court "accept[s] all factual allegations in the complaint as true, and draw[s] all reasonable inferences in the
    plaintiff's favor.") ........................................................................................................... 9, 21

**Statutes**

15 U.S.C. §78c(a)(79) ............................................................................................................. 8

C.P.L.R. §201 ....................................................................................................................... 10

C.P.L.R. §202 ............................................................................................................... 2, 15, 16

C.P.L.R. §213(2) ................................................................................................................ 18

C.P.L.R. §213(8) ...................................................................................................... 17, 18, 19

Civil Code Article 298 ................................................................................................... 16, 17

Civil Code Article 473 ......................................................................................................... 16

New York Civil Practice Law ............................................................................................... 15

**Other Authorities**

Fed. R. Civ. P. 8 ..................................................................................................................... 5

Fed. R. Civ. P. 8(a)(2) ............................................................................................................ 2

Fed. R. Civ. P. 9(b) .......................................................................................................... 2, 21

Fed. R. Civ. P. 15(a) ............................................................................................................ 25

## I.      Introduction

In its Motion to Dismiss ("MTD"), ING[1] tacitly concedes breaches of Guidelines 8–12 of the Revised 2007 Mandate incorporated into its Investment Management Agreement ("IMA with MashreqBank, psc ("Mashreq") on February 5, 2007. ¶¶11, 144; Exs.1–2.[2] On this basis alone, the MTD must be denied. ING instead relies on a "statute of limitations" affirmative defense without credible basis because §2(d) of the IMA did not create a statute of limitations, was never viewed by the parties as such, is unenforceable by ING due to its own breaches, and at any rate Mashreq timely objected in writing. ¶¶61; Ex. 7; *see also* Declaration of Azra Z. Mehdi ("Mehdi Decl."), Ex. A, filed herewith.

ING — through its silence — further concedes that it has no defense against Mashreq's breach of fiduciary duty claim arising out of ING's failure to do ***any*** portfolio research, let alone "original research" for the purchase of the 11 Securities.[3] Had ING done even preliminary research — like reading the offering circulars for the 11 Securities — they would have identified the following common characteristics of the toxic securities comprising ***70% of the portfolio***:

- The securities were ***not registered*** with the Securities and Exchange Commission ("SEC").
- Offering circulars and prospectuses for the securities were ***not publicly available***.
- The collateral underlying the securities was not identified, but disclosure was made that it was "***below investment grade***."
- The securities were ***illiquid and unmarketable***.
- The securities had maturities of up to ***28, 33 or 40 years***.

---

[1] ING collectively refers to defendants ING Investment Management Co., LLC ("IIM") and Richard Kilbride ("Kilbride").

[2] All paragraph ("¶") references are to the Complaint, filed April 8, 2013. Numbered exhibits (*i.e.* "Ex. 1") referenced herein are to the Exhibits attached to the Complaint and lettered exhibits (*i.e.* "Ex. A") are to the exhibits attached to the Declaration of Daniel J. Toal in support of defendants' MTD unless otherwise noted.

[3] The term "11 Securities" refers to Commercial Industrial Finance, Emporia Preferred Funding, Galena CDO Ltd, Harch CLO Ltd, Libertas Preferred Funding Ltd, Liberty Harbour CDO Ltd, Madison Park Funding Ltd, Sigma Finance Corp., Taberna Preferred Funding Ltd, Fraser Sullivan CLO Ltd, and Octagon Investment Partners XI. ¶90.

- The securities were rife with conflicts of interests.
- The securities had **no named independent auditor**.
- The issuers were shell corporations with **no separate assets** or operations.

*See, e.g.*, ¶¶8, 93–143 (using the Madison Park Ltd IV offering circular). Each of these characteristics individually violated Mashreq's Revised 2007 Mandate. *Id.*; Ex. 2. Only two inferences can be drawn from these facts: (1) ING did not read the offering circulars for any of the 11 Securities, thereby breaching the IMA and its fiduciary duty to Mashreq; or (2) ING knew of the toxic illiquid nature of the 11 Securities and invested in them anyway, thereby defrauding Mashreq. ING is silent regarding these allegations. Instead, ING incorrectly asserts that N.Y. C.P.L.R. §202 protects it from suit because the limitations' period of the United Arab Emirates ("UAE") applies. The problem with ING's defense is that the suit could never have been brought in the UAE and even if it could have been brought, the applicable UAE limitations' period would be ten years — four years longer than in New York. *See* Declaration of Saleh Al Obeidli ("Al Obeidli Decl."), filed concurrently herewith.[4]

The Complaint allegations far exceed Fed. R. Civ. P. 9(b) standards detailing the who, what, where, when and how of ING's fraud, its concealment and material misrepresentations in connection with its misconduct. The Complaint details ING's continued misconduct after Mashreq's discovery on July 31, 2007, withholding information about the 11 Securities despite Mashreq's repeated requests. ¶¶6, 60–65, 74. The facts underlying the breach of fiduciary duty and fraud claims, although grounded in the contractual relationship, are sufficiently unique that the claims are not duplicative. Finally, any consideration of appropriate damages and remedies now would be premature. The remainder of ING's contentions are disputed factual issues not properly resolved at the pleading stage. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 585 (2007) ("Rule 8(a)(2) does not contemplate a court's passing on the merits of a litigant's claim at the pleading stage.

---

[4] Mashreq's suit against ING is timely under relevant New York statute of limitations because the parties entered into a tolling agreement and agreed to toll applicable statute of limitations.

Rather, the simplified notice pleading standard of the Federal Rules relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims.").[5] The MTD should be denied in its entirety.

## II.   Relevant Factual Background

Mashreq entered into an IMA with IIM in February 2005 to invest $108 million in a very conservative ING Intermediate Fixed Income Separately Managed Account ("Account"). Recitals; Ex. 1. The Account was fully discretionary but governed by specific investment guidelines incorporated into the IMA ("Original Mandate"). *Id.* In November 2006, ING urged Mashreq to revise the Original Mandate, which led to the Revised 2007 Mandate. ¶¶2, 39; Ex. 2. ING sought to revise the investment guidelines to "[e]xpressly allow CDOs, CBOs, CLOs and other structured products," a recommendation Mashreq emphatically rejected as violative of Mashreq's internal guidelines. ¶¶3, 45, 53, 66; Exs. 4–5, 7. Notwithstanding that specific prohibition, only two days after the Revised 2007 Mandate was executed, ING — unbeknownst to Mashreq — began massive purchases of CDOs and CLOs. ¶¶5, 58. In addition to being in total breach of the IMA and the Revised 2007 Mandate (Guidelines 4 and 5), these purchases violated a multitude of other provisions, including: (i) the "Exposure Limits" established in Guideline 6 because the 70% position in CDOs/CLOs exceeded the exposure limit for every single type of permitted security (¶¶7, 11, 144); (ii) the "Value at Risk" monitoring and notification responsibilities of Guideline 8, which required ING to monitor portfolio volatility and report to Mashreq if the daily marked to market valuation declined by more than 1% (¶¶11, 144); (iii) the requirement to undertake any hedging, shorting or other risk-minimization strategies (Guidelines 9–12) (*id.*); (iv) the failure to meet — by over 4,000 basis points — the agreed "Performance Benchmark" of three-month LIBOR plus 0.50% of Guideline 7 (*id.*); and (v) the failure to invest in securities that met the letter and spirit of

---

[5] Citations and internal quotations are omitted and emphasis is added unless otherwise noted.

Guideline 2 on "Credit Quality" requiring that all portfolio securities be investment grade and liquid (*id.*).

ING obstructed Mashreq's ability to discover the 11 Securities by categorizing them under "ABS" in monthly statements thus preventing discovery of the true nature of the securities. ¶¶6, 60–61; Ex. 7. When Mashreq discovered the improper purchases and demanded that ING explain why it purchased the prohibited securities on July 31, 2007, ING was evasive and defensive. ¶61. On August 7, 2007, Mashreq informed ING in writing that its purchases violated the IMA and Revised 2007 Mandate, requested a liquidation of the portfolio and terminated the relationship. Ex.7; Mehdi Decl., Ex. A. Mashreq lost millions.¶¶13, 43, 153.

## III.    Applicable Legal Standard

On a Rule 12(b)(6) motion to dismiss, the court must "accept[] all factual allegations in the complaint and draw[] all reasonable inferences in the plaintiff's favor." *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008). To survive, a complaint need only "contain sufficient factual matter" to support a "reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*, 778 F. Supp. 2d 375, 394 (S.D.N.Y. 2011).

## IV.    The Complaint Adequately Alleges a Claim For Breach of Contract.

To state a claim for breach of contract under New York law, a complaint need only allege the existence of an agreement, adequate performance of the agreement by the plaintiff, breach of the agreement by the defendant, and damages. *Harsco Corp. v. Segui*, 91 F.3d 337, 348–49 (2d Cir. 1996) (reversing dismissal of a breach of contract claim observing that the district court may have applied an overly strict pleading standard). Here, Mashreq has pled the existence of an agreement (Complaint recitals at 1; Exs. 1–2; ¶155), Mashreq's performance of the agreement (¶156), ING's

breach (¶¶11, 144, 157–158), and damages (¶¶153, 174). Mashreq has more than adequately pled breach of contract under Fed. R. Civ. P. 8 and *Iqbal*.[6]

ING concedes breach of Guidelines 8–12 of the IMA. On this basis alone, the MTD must be denied. To the extent that ING raises any argument in reply, such argument should not be considered. *See Evangelista v. Ashcroft*, 359 F.3d 145, 156 n.4 (2d Cir. 2004). Indeed, ING never suggests its own substantial performance of the IMA and appears not to disagree that, at least with respect to the contract as a whole, it "substantially failed to perform its side of the bargain or, synonymously, … committed a material breach." *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 186 (2d Cir. 2007). Instead, ING inexplicably urges the piecemeal dismissal of "allegations pertaining to" specific contract provisions. MTD at 11–12 ("Mashreq does not plausibly allege a breach of the vast majority of those provisions. The allegations ***pertaining to those provisions*** therefore should be dismissed."). Even if ING only partially breached a specific provision, and here, they were material, such a "partial" breach is relevant to whether ING breached the contract as a whole, and thus forms a necessary part of a fact-based assessment for summary judgment and trial. *See Hadden v. Consol. Edison Co.*, 312 N.E.2d 445, 449 (N.Y. 1974). The issue of whether a party has substantially performed is usually a question of fact and should be decided as a matter of law only where the inferences are certain. *Anderson Clayton & Co. v. Alanthus Corp.*, 457 N.Y.S.2d 578, 579 (2d Dep't 1983).

---

[6] *See Manolis v. Brecher*, No. 11 Civ. 2750 (RMB)(HPB), 2012 WL 527450, at *3 (S.D.N.Y. Feb. 16, 2012) ("Particularity in a contract pleading is not required.") (citing *Shilkoff, Inc. v. 885 Third Ave. Corp.*, 750 N.Y.S.2d 53, 54 (1st Dep't 2002); *MBIA Ins. Corp. v. Credit Suisse Sec. (USA) LLC*, 927 N.Y.S.2d 517, 534 (Sup. Ct. N.Y. Cnty. 2011) ("Although MBIA may ultimately be required to itemize the breaches constituting its contract claims, the pleadings give sufficient notice of the claims at this juncture."), *rev'd on other grounds*, 102 A.D.3d 488 (1st Dep't 2013).

### A.   ING's Factual Arguments Regarding Breaches of Specific Provisions Raise Disputed Issues of Contract Interpretation.

"Under New York law, the fundamental neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent." *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co.*, 375 F.3d 168, 178 (3d Cir. 2004) (quoting *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002)). Where the parties' intent cannot be discerned from the contractual language itself, a court may seek to determine the intent of the parties by "consider[ing] evidence extrinsic to the contract, including testimony offered by the parties." *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 51 (2d Cir. 2011).

Here, ING seeks to submit extrinsic evidence to support its own interpretations of contract terms but then insists that "Mashreq may not seek to vary those [contractual] terms by reference to supposed oral agreements or understandings." MTD at 13–15 (citing *Garza v. Marine Transp. Lines, Inc.*, 861 F.2d 23, 26 (2d Cir. 1988)). *Garza* does not support ING's position. The *Garza* court explained: "The [parol evidence] rule excludes 'only evidence of prior understandings and negotiations which contradicts the unambiguous meaning of a writing which **completely** and **accurately** integrates the agreement of the parties.'" 861 F.2d at 27 (quoting *Battery S.S. Corp. v. Refineria Panama, S.A.*, 513 F.2d, 735, 739–40 (2nd Cir. 1975)) (emphasis in original). When extrinsic evidence is considered for the purpose of interpretation, the parol evidence rule is inoperative. *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1320 n.2 (2nd Cir. 1975). Then, the evidence is not considered to vary or contradict the terms of an integrated agreement; rather, the parol is used to determine what the terms of the agreement are. Arthur L. Corbin, 3 A. Contracts §579, at 421–22 (Supp. 1971). Here, as in *Garza*, extrinsic evidence may be considered for the purposes of interpreting (as opposed to contradicting) the terms of the IMA and the revisions that led to the Revised 2007 Mandate.

ING conveniently ignores the interlocking nature of the Guidelines in the Revised 2007 Mandate for purposes of interpretation. Viewed as a group and comparing the revisions to various Guidelines side-by-side with the seven proposals in the November 2006 Presentation makes clear the unequivocal prohibition on CDOs, CBOs and CLOs.[7] Indeed, two of the proposals were specifically rejected by Mashreq, while five were accepted. ¶¶3, 48, 52, 54–56. All five accepted proposals were clearly and redundantly reflected in the revisions to the Guidelines (¶¶54–56, 81) while both rejected proposals were not. ¶¶49–53, 82. ING now asks this Court to improperly interpret this manufactured ambiguity in a way that absolves them from liability. Thus, ING's argument that the intent to "Expressly allow CDOs, CBOs, CLOs, and other structured products," is reflected ***implicitly*** in the Revised 2007 Mandate (*see* MTD at 13; Ex. 7) is belied by comparison with the clarity and redundancy of the revisions made to reflect the proposals that were actually accepted. ¶¶81–82.

Moreover, the absence of any exposure limits on CDOs, CBOs and CLOs despite the presence of exposure limits on every other asset class permitted, including corporate bonds, bank bonds, MBS and A-rated MBS (Ex. 2) reinforces the interpretation that they were ***not*** permitted.

ING's proposed interpretation of Guidelines 4 (Permitted Securities) and 5 (Prohibited Securities) in its MTD is even less persuasive than its September 16 e-mail. *Compare* MTD at 12-15 *and* ¶¶73–86; Ex. 7. ING's MTD fails to acknowledge that "mortgage and other asset-backed securities" based on pools of mortgages and other consumer receivables are listed as Permitted Securities in an identical fashion in every version of the Original Mandate and the Revised 2007 Mandate. *See* ¶¶6, 60; Exs. 1–2. ING's argument regarding the term "asset-backed securities" is tantamount to stating that the definition, "mortgage and other asset-backed securities," miraculously

---

[7] *See Huen N.Y., Inc. v. Bd. of Educ. Clinton Cent. Sch. Dist.*, 890 N.Y.S.2d 748, 750 (4th Dep't 2009) (concluding that deletion of old provision and substitution of new provision regarding claims procedure "establishes the parties' intent to remove claims based on delay").

changed in February 2007 to include CDOs. MTD at 13. That is absurd. "No contract should ever

be interpreted and enforced with a meaning that neither party gave it." 3 A. Corbin, Contracts

§572B, at 198.

ING's reliance on legal opinions dating from 2011 to 2013, as well as language added to 15

U.S.C. §78c(a)(79) on July 21, 2010 describing CDOs as a type of "asset-backed security," is wholly

misplaced. MTD at 13. None of these **recent** uses of the term "asset-backed security" explains what

"mortgage and other asset-backed securities," meant in the instant context in 2005–2008 or in the

IMA.[8] *See* Mehdi Decl., Ex. B (for the contemporaneous meaning and usage of the term, "asset-

backed security" or "ABS"). "A word is not a crystal, transparent and unchanged, it is the skin of a

living thought and may vary greatly in color and content according to the circumstances and the

time in which it is used." *Towne v. Eisner*, 245 U.S. 418, 425 (1918) (Holmes, J.), *superseded on other

grounds*, *Union P.R. Co. v. United States*, 524 F.2d 1343 (1975). In addition, ING defends its

interpretation of Guidelines 4 and 5 based on the assertion that "ING's practice of categorizing

those securities as ABS was **fully disclosed** to Mashreq in the November 2006 presentation." Ex. 4

at 4 (emphasis in original); MTD at 4, 13–14, 17. In reality, page 4 of the presentation does not

present any information whatsoever about ING's practices. On the contrary, page 4 portrays a

"Traditional View" that ING disavows and distinguishes from "Our View" on page 5. *Compare* Ex. 4

at 4 *and* 5.

ING's arguments about embedded leverage (MTD at 14) are inconsistent with the

Complaint allegations. ¶¶75–80 ("The only reasonable interpretation of the deletion of the

prohibition [of securities with embedded leverage] was simply that it was necessary given the

---

[8] A word or phrase is ambiguous when it is capable of more than a single meaning "'when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" *Walk-In Medical Ctrs., Inc. v. Breuer Capital Corp.*, 818 F.2d 260, 263 (2d Cir. 1987) (quoting *Eskimo Pie Corp. v. Whitelawn Dairies, Inc.*, 284 F. Supp. 987, 994 (S.D.N.Y. 1968)).

inclusion of futures, options, swaps and derivatives in the Revised 2007 Mandate" under Guideline 10). At the pleading stage, the Court must accept Mashreq's plausible interpretation. *See Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 128 (2d Cir. 2011) (In deciding a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the court "accept[s] all factual allegations in the complaint as true, and draw[s] all reasonable inferences in the plaintiff's favor.").

ING's arguments regarding Guideline 6 (MTD at 15) are likewise adequately addressed in the Complaint (¶¶7, 11, 82, 144.d):

> The toxic illiquid securities exceeded the "Exposure Limits" established in guideline 6. . . . The Revised 2007 Mandate does not include an exposure limit for CDOs/CLOs because they were not permitted securities. Meanwhile … the 70% position in CDOs/CLOs **significantly exceeded all stated exposure limits and was four times the exposure limit for their closest analogue**.

¶¶7, 11, 82, 144.d.

When 70% of a portfolio is invested in private, illiquid, unregistered, fee-laden blind pools of cast off sub-investment-grade loans — pools that the issuers emphatically disclosed were rife with conflicts of interest and not subject to meaningful audit — it creates questions of fact, incapable of resolution at the pleading stage. ¶¶74, 110–112. Such a portfolio would not accord with any reasonable interpretation of the intentions of parties that the investment portfolio was to be restricted to "investment grade securities." ¶11.a.

Finally, regarding Guideline 7 in which the parties agree to a performance benchmark of LIBOR plus .50%, ING argues in effect that Guideline 7 had no meaning whatsoever, which would be contrary to New York law. *Rothenberg v. Lincoln Farm Camp, Inc.*, 755 F.2d 1017, 1019 (2d Cir. 1985) (An interpretation "that gives a reasonable and effective meaning to all the terms of a contract is generally preferred to one that leaves a part unreasonable or of no effect.").[9] ING relies on *Pension*

---

[9] *See also Ronnen v. Ajax Elec. Motor Corp.*, 671 N.E.2d 534, 536 (N.Y. 1996) ("We have long and consistently ruled against any construction which would render a contractual provision meaningless or without force or effect.").

*Benefit Guaranty Corp. v. Morgan Stanley Investment Management*, 712 F.3d 705, 727 (2d Cir. 2013) which

stands for the proposition that a decline in a security's market price does not, **by itself**, give rise to a

reasonable inference that holding that security was or is imprudent. Mashreq does not rely solely on

the decline in price. *Pension Benefit* is not only inapposite, it also describes facts that by comparison

highlight the extremity of ING's conduct here.[10]

> **B.     Mashreq's Breach of Contract Claim Is Timely.**

ING asserts that one sentence in §2(d) of the IMA[11] created a 30-day statute of limitation,

i.e., in this Circuit the time period within which a lawsuit may be commenced after a cause of action

has accrued. *See Stuart v. Am. Cyanamid Co.*, 158 F.3d 622, 627 (2d Cir. 1998). According to ING, that

period began to run the day Mashreq received any statement about any transaction and expired 30

days later. MTD at 6–7. A statute of limitations provides an affirmative defense, and the burden is

on the defendant to establish it. *Gonzalez v. Hasty*, 651 F.3d 318, 322 (2d Cir. 2011). While limitations

may be "prescribed by written agreement," an unreasonably short limitation period is against public

policy and unenforceable. *Staff v Lido Dunes, Inc.*, 262 N.Y.S.2d 544, 548 (1965). The sentence in

§2(d) is not, nor was it ever intended to be, a statute of limitations under N.Y. C.P.L.R. §201 in the

first place.

ING's reliance on *Assured Guaranty (UK) Ltd. v. J.P. Morgan Investment Management, Inc.*, 915

N.Y.S.2d 7, 10 (1st Dep't 2010), *aff'd*, 962 N.E.2d 765 (N.Y. 2011) is entirely misplaced. Section 2(d)

of the IMA simply does not create a statute of limitations and was never viewed as such by the

---

[10] ING's argument that it is immune from liability from claims due to the Account's investment performance based on the language of §10 of the IMA, "Liability and Indemnification," is unavailing because any such indemnification is excepted for "actions or omissions resulting from IIM's gross negligence or bad faith." Ex. 1, §10. Clearly the allegations here encompass gross negligence and bad faith.

[11] "All transactions effected for the Account will be deemed to be in compliance with the Investment Guidelines unless written notice to the contrary is received by IIM from Client within 30 days following first issue of the periodic report containing such transactions." Ex. 1.

parties. The terms in *Assured Guaranty* are nothing like those in the instant case. In *Assured Guaranty*, the language of the IMA unambiguously indicated that the parties intended to limit all liability and create a statute of limitations. The corresponding terms of the contract at issue in *Assured Guaranty* are as follows:

> 7.  <u>Information and Statements</u>. (a) … Client agrees to review promptly all statements and advices. . . .
>
> (d) Except with respect to any act or transaction of Investment Advisor as to which Client shall object in writing to Investment Advisor within a period of ninety (90) days from the date of receipt of any statement from Investment Advisor, Investment Advisor and all of its employees, representatives, directors, officers, shareholders, fiduciaries, employee benefit plans, or any affiliate thereof (collectively, the "JPMC Entities and Persons") ***shall upon the expiration of such period be released and discharged from any liability or accountability to Client and any of its agents or representatives*** as respects the propriety of acts, omissions, and transactions to the extent shown in such statement.

Mehdi Decl., Ex. C at 4 (excerpts of Exhibit. A to *Assured Guaranty (UK) Ltd. v. J.P. Morgan Investment Mgmt., Inc.*, No. 603755/08, First Amended Complaint (N.Y. Sup. Ct. May 13, 2009)). The sole basis for ING's affirmative defense — i.e., §2(d) — neither contains any words such as "liability," "indemnify" or "release," nor is it located in the "Liability and Indemnification" section of the IMA. Notably, ING never even mentioned this "30-day" objection clause until September 16, 2007, five weeks after Mashreq provided written notice and even then ING did not contend that §2(d) was a statute of limitations. ¶¶63–89; Exs.5–7. Indeed, ING's December 14, 2007 proposal — five months after Mashreq's discovery of the purchase of the 11 Securities — contradicts ING's hindsight interpretation of §2(d) as a statute of limitation. ¶¶13, 87–89. Reviewing the IMA as a whole, §2 of the IMA entitled "Discretionary Management Powers" concerns the limits of ING's discretion, not the limits of its liability.

Significantly, the *Assured Guaranty* plaintiffs never alleged that the securities that generated losses were not permitted in the investment guidelines. Here, in contrast, Mashreq alleges that ING

blatantly breached the IMA in seven different ways. ¶¶11, 144, 154–174. From a portfolio management perspective, ING's investment conduct was invested in precisely such securities. ¶7. CDOs and CLOs were prohibited in the Account and 70% of the Account was invested in precisely such securities. *Id.* ING exceeded all percentage concentration limits (ranging from 15% for A-rated mortgage-backed securities to 50% for corporate bonds and MBS) that applied to any security-type that *was* permitted. Ex. 2; ¶¶7, 11, 44.

### C.    ING's Attempt to Use Extrinsic Evidence to Defeat Mashreq's Claims Must Fail.

ING asks the Court to accept the truth of the contents of proffered documents Exhibits A–H, and to rely on their proffered truth to dismiss the Complaint. Where a defendant seeks to dismiss a complaint based on documentary evidence, the motion will succeed only if "the documentary evidence utterly refutes plaintiff's factual allegations, conclusively establishing a defense as a matter of law." *Goshen v. Mutual Life Ins. Co.*, 98 N.Y.2d 314, 326 (2002). Rather than establishing a defense as a matter of law, ING's exhibits create more material factual disputes incapable of resolution at the pleading stage.

Mashreq entirely objects to judicial notice of Exhibit H — *Bloomberg* print-outs from May 2013 — because they provide nothing readily identifiable or undisputable about what may or may not have been available on *Bloomberg* in 2007. ING's sole support for judicial notice is two cases in which courts took judicial notice of stock price charts from *Bloomberg*. MTD at 8, n.6. Stock price charts by definition display historical information whereas Exhibit H purports to provide evidence of what information was "readily obtainable" by Mashreq in 2007. Exhibit H is, at best, evidence of what information was obtainable six years later. Similarly, the Court may not accept judicial notice of Exhibit A — Mashreq's website printouts from May 2013 — to make a factual determination of Mashreq's sophistication six years earlier in 2007.

With respect to Exhibits B–G, Mashreq does not question that these documents **exist**. However, Mashreq disputes the accuracy and truth of the contents of Exhibits B–G. In fact, Exhibits B–G constitute admissions that the monthly account statements that ING now asserts triggered the commencement of the 30-day period were **themselves fraudulent**. Specifically, ING took pains to abbreviate each and every one of the 11 Securities instead of providing the full names of the securities on the Portfolio Summary pages of all of these reports. Exs. B–E. Significantly, the names of the securities appear in an unabbreviated form on the "Transactions" tab of the same Excel files, demonstrating that ING consciously took steps to abbreviate them in the main Portfolio Summary. *See* Exs. B–D. For example, *compare* Ex. D at 4 listing "HARCH 20071AC" *to* 6 "HARCH CLO Ltd." Ironically, ING now claims that ING inadvertently neglected to abbreviate the securities on the Transactions tab as evidence that it identified "certain" of the securities as CDOs and CLOs. *See* MTD at 8, 17; Exs. B–E.

Indeed, the first time that the 11 Securities appear in unabbreviated form in the Portfolio Summaries is July 18, 2007 and August 10, 2007. Exs. F–G. Following the July 18, 2007 report, Mashreq requested the July 31, 2007 conference call when Mashreq for the first time learned that investments in CDOs and CLOs had been fraudulently labeled as "ABS." ¶61. This conference call was followed shortly thereafter with Mashreq's letter of August 7, 2007. Mehdi Decl., Ex. A. The letter objects to the contents of the portfolio as violating the IMA and requests an orderly liquidation of the portfolio. *Id.* ING feigns ignorance and even misleads the Court in its chart identifying the objection date as August 29, 2007 (MTD at 7) when, in fact, documents attached to the Complaint and incorporated by reference therein, evidence ING's acknowledgment of the receipt of the August 7, 2007 letter. *See* Ex. 7 (James Kauffmann's e-mail states: "We were quite frankly surprised by the reference in your August 7, 2007 letter to this portfolio as a 'low risk

portfolio within our Liquidity Book.'"). These facts raise disputed issues of material fact, improper on a motion to dismiss.

Further, beginning on May 18, 2007, at Mashreq's request, the monthly statements began to include a "breakdown" that is "based on the appropriate Lehman Sectors." Ex. D. These breakdowns would have revealed ING's misconduct, but for ING's fraud in including CDOs and CLOs in the category "ABS" in the Lehman Sector breakdowns (*see also* Exs. D–G). *See* Mehdi Decl., Ex. B, which reproduces a description by Lehman Brothers in March 2008 of its Lehman Brothers Global Sector Classification Scheme, including description of the Lehman Brothers U.S. Floating-Rate Asset-Backed Securities Index. The documents belie the notion that CDOs, CBOs and CLOs were properly classified under the Lehman Sector, "ABS." *See also* ¶¶6, 60 (Mashreq understood ABS securities to be backed by consumer loans, car loans and credit card receivables.). Exhibits A–H create stark disputes over factual issues and the Court cannot resolve this and other similar disputes of material fact, and lacks doctrinal authority to accept defendants' rather than plaintiff's version of such a factual disagreement at the pleading stage of the litigation. *Arbitron, Inc. v. 3 Cities, Inc.*, 438 F. Supp. 2d 216, 218 (S.D.N.Y. 2006).

A court may dismiss a claim on the basis of an affirmative defense only if "the facts supporting the defense appear[ ] on the face of the complaint," and "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *McKenna v. Wright*, 386 F.3d 432, 435–36 (2d Cir. 2004). ING has failed to satisfy this burden and the MTD should be denied.

**V.      Mashreq's Breach of Fiduciary Duty and Fraud Claims Are Timely, Adequately Pled and Not Duplicative.**

**A.  New York's "borrowing statute," N.Y. C.P.L.R. Section 202, Is Inapplicable.**

New York's borrowing statute, N.Y. C.P.L.R. §202, is interpreted "to effectuate the purpose which the statute was designed to serve," *i.e.* "to prevent forum shopping by plaintiffs." *Stafford v. Int'l Harvester Co.*, 668 F.2d 142, 151 (2d Cir. 1981). "Courts have held that application of C.P.L.R. §202 is not necessary where the suit could not have been brought in a foreign forum with a shorter statute of limitations, for the obvious reason that in such a case, there is no danger that the plaintiff has brought suit in New York to take advantage of the longer statute of limitations." *Cafferty v. Scotti Bros. Records*, 969 F. Supp. 193, 203 (S.D.N.Y. 1997)(citing *Stafford*, 668 F.2d at 152–53) (policy rationale of N.Y. C.P.L.R. §202 did not require application of shorter Pennsylvania statute of limitations where cause of action could not have been brought there); *Insurance Co. of North America v. ABB Power Generation*, 925 F. Supp. 1053, 1060 (S.D.N.Y. 1996) (application of borrowing statute to prevent forum shopping not necessary where parties had contractually agreed not to bring suit in California). ING relies on both *Cafferti* and *ABB Power*. MTD at 9.

New York Civil Practice Law and Rule §202 are not applicable where, as here, Mashreq could not have brought suit in the UAE because (i) UAE courts do not apply foreign law where the jurisdiction does not follow civil law and UAE courts do not follow common law legal precedent (Al Obeidli Decl., ¶11); (ii) the parties did not consent to the jurisdiction of the courts of the Dubai International Financial Centre which do apply foreign law(Al Obeidli Decl., ¶12) and (iii) ING intended not only for the application of the substantive law of New York, but also for the District Court in the Southern District of New York to be the venue for suits as proposed by ING in February 2008 in the winding up of Mashreq's ING Account. *See* Mehdi Decl., Ex. D, §6 (Proposed Third Amendment to IMA drafted by ING) ("the exclusive venue and jurisdiction for all disputes shall be in the U.S. Federal District Court for the Southern District of New York").

Here, just as in *Stafford* and *ABB Power*, "the policies underlying New York's borrowing statute are not served in any way by applying the limitations period of [the UAE] to bar a cause of action which never could have been brought in [the UAE]." *Stafford*, 668 F.2d at 152.

**B.      Even if N.Y. C.P.L.R. Section 202 Applied, Ian Edge Is Wrong and New York Has the Shorter Statute.**

Assuming *arguendo* that N.Y. C.P.L.R. §202 applies in these circumstances, New York has the shorter statute of limitations. ING's proffered foreign law expert, Ian David Edge, posits that the UAE applies Islamic law. Declaration of Ian David Edge ("Edge Decl."), ¶8. Mashreq agrees. Al Obeidli Decl., ¶¶5, 11. The UAE applies civil law and does not follow the concept of legal precedent under common law jurisprudence (Al Obeidli Decl., ¶¶11–12; Edge Decl., ¶¶11–12). The parties also agree that the standard limitations period in the UAE is 15 years. Al Obeidli Decl., ¶5; Edge Decl., ¶17. That, however, is where the agreement ends.

According to Mr. Al Obeidli, a practicing Banking, Finance and Commercial and Disputes lawyer in the UAE, Islamic law distinguishes between claims that would be subject to UAE Civil Code Article 473 (applying a 15-year limitation to liabilities arising from a contractual relationship) versus UAE Civil Code Article 298 (applying a 3-year limitations period for liabilities arising from a public relationship). Al Obeidli Decl., ¶¶6–7. Further, under UAE law, where two commercial parties interact with each other pursuant to a contract (here, the IMA) the limitations period applicable to all claims arising out of that relationship is ten (10) years. *Id.* Mr. Al Obeidli opines that because all claims in the Complaint arise from the contractual relationship between commercial parties, the limitations applicable to the breach of contract, breach of fiduciary duty and fraud claims is ten years. Al Obeidli Decl., ¶¶6–10.

With respect to the breach of fiduciary duty claim, Mr. Al Obeidli finds Mr. Edge's analysis to be incomplete and unsupportable. Mr. Edge notes that "Count 2 is for breach of fiduciary duty based upon contract and the common law" (Edge Decl., ¶16), but then limits the application of

analysis to common law stating: "Count 2 in so far as it relies on a common law duty of fiduciary duty would not fall under a contractual heading" (Edge Decl., ¶19) without explaining **why** he was making that limitation and **how** that claim could be brought in the absence of a contract under UAE law. *See* Al Obeidli Decl., ¶8. With respect to the fraud claim, Mr. Al Obeidli opines that Mr. Edge seems to agree that the three-year limitations period for harmful act under Article 298 of the UAE Law of Civil Transactions **only** applies "deceit **outside** contract." Al Obeidli Decl., ¶9. Ergo a ten-year limitations period applies to "deceit within a contract" between commercial parties. Al Obeidli Decl., ¶¶9–10.

Mr. Edge attempts to create a non-existent exception to contractual liability for breach of fiduciary duty and fraud, but fails to explain why or how those claims could exist as stand-alone claims in this case. *Id.* But Mr. Edge is not a practicing lawyer in the UAE, does not live in or near the UAE, does not appear to speak Arabic and is not permitted to appear in courts in the UAE. Thus, the Court should not give **any** weight to the conclusions reached by Mr. Edge in connection with the facts here. Because the UAE has a ten-year statute of limitations, New York's six-year statute of limitations applies to both the fraud as well as the breach of fiduciary duty claims.

## C.   The Applicable New York Statute of Limitations for Mashreq's Fraud and Breach of Fiduciary Duty Claims Is Six Years.

The six-year limitations period in N.Y. C.P.L.R. §213(8) applies to Mashreq's fraud claim. Mashreq discovered ING's fraud on July 31, 2007. ¶61. Mashreq's claim for fraud is timely so long as it was brought before July 31, 2013. Mashreq's Complaint was filed on April 8, 2013 and thus, is timely.

For breach of fiduciary duty, New York law does not provide a single statute of limitations. *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 139 (2009). "New York law permits certain actions for damages to property or pecuniary interest to be brought under a tort or contract theory, and hence applies the longer of the two statutes of limitations, as long as the asserted liability

has its genesis in the contractual relationship of the parties." *Malmsteen v. Berdon LLP*, 369 F. App'x 248, 250 (2d Cir. 2010) (for a fiduciary duty claim sounding in contract, New York law applies a six-year statute of limitations under N.Y. C.P.L.R. §213(2)).

In circumstances very similar to those raised in this case, another court in this District held that "for a fiduciary duty claim sounding in contract, New York law applies a six-year statute of limitations." *Ironshore Ins., LTD v. Western Asset Mgmt. Co.*, No. 11 Civ. 05954 (LTS)(JCF), 2012 WL 1981477, at *4 (S.D.N.Y. May 30, 2012) (where plaintiff Ironshore asserted a cause of action for breach of a fiduciary duty, arising from the investment management agreement between the parties, the claim had its genesis in a contractual relationship, a six-year statute of limitations applied); *see also Mejia-Ricart v. Bear Stearns & Co.*, No. 95 Civ. 582 (LLS), 1996 WL 94810, at *4 (S.D.N.Y. Mar. 1, 1996) (applying a six-year statute of limitations to a claim for breach of fiduciary duty brought against an investment broker because the parties' relationship was "contractual"). Finally, ING acknowledges "where an allegation of fraud is essential to a breach of fiduciary duty claim, courts have applied a six-year statute of limitations under N.Y. C.P.L.R. 213 (8)," but then contends that Mashreq's allegations of fraud are not essential to its breach of fiduciary duty claim because they are identical to the breach of contract claim. MTD at 11, n.10. As detailed in §§V.D., VI., *infra*, Mashreq's claims are not identical and thus Mashreq's breach of fiduciary duty claim is also timely.

### D. Mashreq's Fraud, Breach of Contract and Breach of Fiduciary Duty Claims Are Each Based on Unique Factual Allegations.

The breach of the IMA is alleged by reference to seven specific breaches of the IMA. ¶¶11, 144. These claims primarily create factual issues of contract interpretation, such as the exclusion of CDOs, the definition of an "asset-backed security," and so forth. *See supra* §IV. In contrast, the breach of fiduciary duty claims are alleged primarily by reference to the latter half of the Complaint, which is a detailed discussion of the common characteristics of the 11 Securities using Madison Park as an example. ¶¶93–143, 160–168. These claims allege, among other things, that the 11 Securities

— regardless of whether they were labeled "CDOs," "ABS," or anything else — were by their terms so outrageously risky and inappropriate that ING grossly breached its duties of good faith, loyalty, candor and fair dealing as Mashreq's fiduciary by investing in them. *Id.* Finally, the fraud claims are alleged by reference to a pattern of deception, accompanied by an intent to deceive, that began in November 2006 and continued for an entire year, and consisted of a series of material misstatements and omissions by ING, as further detailed in §VI, *infra*.

IIM owed Mashreq a fiduciary duty that was distinct from the requirement that ING abide by the provisions of the IMA. Under New York law, "[t]he elements of a claim for breach of a fiduciary obligation are: (i) the existence of a fiduciary duty; (ii) a knowing breach of that duty; and (iii) damages resulting therefrom." *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 138 (2d Cir. 2011). A fiduciary relationship exists between a financial advisor and a client when the advisor possesses discretionary authority to manage the client's accounts. *See, e.g.*, *Assured Guar. (UK) Ltd. v J.P. Morgan Inv. Mgt., Inc.*, 915 N.Y.S.2d 7, 10 (1st Dep't 2010) (where defendant had discretionary authority to manage Orkney's investment accounts, it owed Orkney a fiduciary duty of the highest good faith and fair dealing); *Howell v. Freifeld*, 631 F. Supp. 1222, 1224 (S.D.N.Y. 1986)(maintenance of a discretionary account imposed "'broad' fiduciary duties"); *Brooks v. Key Trust Co. Nat'l Ass'n*, 809 N.Y.S.2d 270, 272 (3d Dep't 2006) (same). The IMA at issue here was such a discretionary account, and thus Mashreq has adequately alleged the existence of a fiduciary relationship. The "existence and extent of any fiduciary duty … must be resolved at trial based on a careful review of the parties' relationship." *Muller-Paisner v. TIAA*, No. 12-3579-cv, 2013 WL 3064858, at *1 (2d Cir. June 20, 2013).

Mashreq has also plausibly and adequately alleged that ING failed to exercise the level of care required of a fiduciary. ¶¶10, 93–143, 160–168. Mashreq has demonstrated using the Madison Park Ltd IV purchase as an illustration that ING either did not conduct minimal research or any due

diligence expected of a fiduciary; or knew the 11 Securities were toxic, illiquid, black boxes and fraudulently dumped them on Mashreq. ¶¶93–143. Either way, ING's conduct reeks of gross negligence in fulfilling its fiduciary duties or bad faith. In fact, the offering circulars that ING presumably reviewed, analyzed and investigated as part of their due diligence show the 11 Securities (1) were not **registered** with the SEC; (2) offering circulars and prospectuses were not available publicly; (3) did not appoint or name an independent auditor; (4) stated that the securities were **unmarketable** in the offering circulars; (5) did not identify the collateral underlying the securities; (6) disclosed that the collateral was **below investment grade**; (7) had maturities that were locked up for more than ten years and in some instances for 28, 33 or 40; and (8) had issuers that were shell corporations without separate assets or operations. ¶¶95–143. If ING knew these facts and purchased the 11 Securities anyway, they engaged in a knowing breach of fiduciary duty. A knowing breach of fiduciary duty may also, if it satisfies the usual common law elements, amount to a fraud or misrepresentation. *See Gordon v. Bialystoker Ctr. & Bikur Cholim, Inc.*, 45 N.Y.2d 692, 698 (1978)(stating that under New York law, where a fiduciary relationship exists between parties, the law of constructive fraud applies); *Kaufman v. Cohen*, 760 N.Y.S.2d 157, 165–66 (1st Dep't 2003) (applying six-year limitations period where the breach of fiduciary duty was premised on allegations of actual fraud). Mashreq's also alleges that "but for" ING's breach of their fiduciary duty, Mashreq would not have incurred the losses it did. ¶¶13, 43, 153. Thus, each of Mashreq's claims relies on sufficiently distinct facts making them non-duplicative.

## VI.   Mashreq's Fraud Claim Is Timely, Non-Duplicative and States a Claim for Relief.

To properly plead a cause of action for fraud under New York law, the complaint must contain allegations of a representation of material fact, falsity, scienter, reliance and injury. *Small v. Lorillard Tobacco Co.*, 94 N.Y.2d 43, 57 (1999). Contrary to ING's contentions, the who, what, where,

when and how of ING's fraudulent conduct are plausibly and meticulously alleged in the Complaint.

The Complaint's detailed allegations sufficiently allege fraud far in excess of Rule 9(b) standards.

Mashreq's unequivocal communication of its anger over the discovery of the purchases of

the CDOs and CLOs and ING's violation of the IMA is expressed in an e-mail to ING by

Tasdique Pasha of Mashreq (Ex. 6)[12]:

> The glaring fact is that your team purchased CDO/CLO tranches when we had verbally agreed [on November 2, 2006] that **CDO/CLO tranches would not be permissible**. . . . I am astonished and perplexed that you do not recall our disallowing CDOs/CLOS as permissible instruments. . . . **I had made the position very clear and members of your team had taken notes to the effect**.

Here, the Court must accept as true Mashreq's allegations that on November 2, 2006: (a)

Mashreq "made very clear" that CDOs and CLOs were not permissible because they expressly

violated Mashreq's internal guidelines; (b) ING (including Kilbride, Kauffmann and Robert Kinsey)

understood, recorded and agreed that CDOs and CLOs were not permitted. ¶¶39–48, 71–72, Exs.

5–7; *see Wilson*, 671 F.3d at 128. Allegations of ING's material misrepresentations and omissions that

it would adhere to Mashreq's admonitions prohibiting the purchase of CDOs, CBOs and CLOs is

particularly and plausibly alleged. ¶¶1–2, 4, 39–45, 49, 71–72. Under New York law, "if a plaintiff

alleges that it was induced to enter into a transaction because a defendant misrepresented material

facts, the plaintiff has stated a claim for fraud even though the same circumstances also give rise to

the plaintiff's breach of contract claim." *First Bank of the Americas v. Motor Car Funding, Inc.*, 690

N.Y.S.2d 17, 21 (1st Dep't 1999); *MBIA Ins. Co. v Countrywide Home Loans, Inc.*, No. 602825108, 2009

WL 2135167 (N.Y. Sup. Ct. July 8, 2009).

   The Revised 2007 Mandate, signed by Kilbride was followed **two days later** by ING's initial

purchases of the 11 toxic, illiquid securities. ¶57; Ex. 2. Between February 8 and July 31, 2007, ING

omitted to disclose that it had purchased CDOs and CLOs that it had been clearly forbidden from

---

[12] Similar sentiments are expressed in greater detail by Abdul Kadir Hussain of Mashreq in Exhibit 7.

purchasing, despite multiple opportunities to make such disclosures in monthly statements, "Portfolio Managers' Notes," e-mails, and phone calls. ¶¶6, 58–60; Exs. B–F. ING's deliberate efforts to disguise the names of the toxic, illiquid securities and classification as ABS to avoid detection, is also alleged. ¶¶6, 60; Ex. 7; Exs. B–E. The first portfolio summary that contained unabbreviated versions of the names was sent on July 18, 2007. Ex. F. Mashreq discovered the fraud two weeks later on July 31, 2007. ¶61; *see supra* §IV.C.

ING's (through Kilbride, Kauffmann and Kinsey) continued deception during a July 31, 2007 conference call after Mashreq discovered that ING was misleadingly categorizing the 11 Securities as ABS and continued reassurances that the 11 Securities were "money good" are also particularly alleged. ¶¶63–65. ING's attempts to deceive Mashreq and conceal the truth facts is confirmed even further by allegations that between July 31 and November 2, 2007, ING omitted disclosure of detailed information regarding the 11 Securities and ING's due diligence, despite multiple opportunities to do so, including specific requests for information from Mashreq, multiple e-mails and phone calls. ¶¶61–86. The offering circulars for the 11 Securities were not publicly available, but as detailed above, fully disclosed that the 11 Securities were not registered, contained below-investment grade and illiquid collateral, did not appoint an independent auditor and contain a plethora of conflicts, such that ING either never read the offering materials or read them and intentionally invested Mashreq's funds in them anyway.

This series of misrepresentations and omissions during the period November 2, 2006 to December 14, 2007, each of which is pled with particularity and fulfills the foregoing elements. "[T]he central issue 'in determining whether material misrepresentations have been sufficiently pleaded is not whether the particular statements, taken separately, were literally true, but whether defendants' representations, taken together and in context, **would have mis[led] a reasonable investor about the nature of the [securities]**.'" *Phoenix Light SF Ltd. v ACE Sec. Corp.*, 39 Misc. 3d

1218(A), 1218A (N.Y. Sup. Ct. 2013) (denying motion to dismiss fraud claim) (emphasis and alteration in original). The Complaint alleges that ING knew that its representations and omissions were materially false when it made them because it knew that it had invested 70% of Mashreq's portfolio in the 11 toxic, illiquid securities. ¶¶58–59. Mashreq reasonably relied on ING's statements and omissions because it had been assured in the November 2, 2006, meeting that CDOs and CLOs would not be permitted in the portfolio (¶¶39–48, 71–72, Exs. 5–7) and because the Revised 2007 Mandate did not allow such investments (¶¶49–53).

ING contends that the Complaint fails to allege motive. MTD at 17-19. However, the Supreme Court has made it clear that motive is not required to plead fraud even in securities cases, which are subject to the highest pleading standards. *See, e.g., Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 325 (2007). In any event, here, motive is adequately pled. ¶¶1, 45. Finally, Mashreq suffered an out-of-pocket loss of $43,623,755 directly as a result of this misconduct. ¶¶153, 174. ING's argument that recent judicial opinions and a recent amendment of a statute that define CDOs as a type of asset-backed security and its claims that the November 2006 presentation "fully disclosed" ING's practice of classifying CDO and CLOs as ABS (MTD at _; Ex. 4 at 4) are both unavailing for reasons discussed in §IV.A., *supra*. Such ambiguities only underscore the deceptiveness of ING's conduct. *Broder v. MBNA Corp.*, 722 N.Y.S.2d 524, 526 (1st Dep't 2001) (small-print footnote to the solicitation offer is ambiguous and, if anything, tends to strengthen the claim that there was a deception). The submission of the *Bloomberg* print-outs that ING obtained in May 2013 demonstrates nothing. *See* §IV.A.3., *supra*. Mashreq alleges that despite repeated requests, ING was evasive and withheld detailed information about the 11 Securities. ¶¶63–64.

In the face of such allegations, ING does not even suggest an alternative inference about what could possibly explain its conduct. *See* MTD at 19–21. The only plausible inference here is that

ING acted with deliberate recklessness[13] or intent "at least as compelling as any opposing inference one could draw from the facts alleged." *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1325 (2011).

Finally, regarding defendant Kilbride: (i) he was at the November 2006 meeting and therefore agreed with Mashreq that CDOs/CBOs/CLOs would not be permitted in the portfolio; (ii) he signed the Revised 2007 Mandate; (iii) he was the "Portfolio Manager" of the portfolio, meaning he chose the investments for the portfolio; (iv) he was the supervisor of the relevant "team" at IIM; (v) he wrote the "Portfolio Manager's Notes" (Exs. B, E); and (vi) he participated in each and every conference call and e-mail exchange referenced in the Complaint. These allegations, viewed in the totality, sufficiently allege Kilbride's role in the fraud. *Tellabs*, 551 U.S. at 326.

## VII.    Questions Regarding Damages Are Premature.

A determination as to the appropriate remedy is premature at the pleading stage when the court's sole consideration is whether plaintiff's complaint states a claim. *See Burkina Wear, Inc. v. Campagnolo, S.R.L.*, No. 07 Civ. 3610, 2008 WL 1007634, at *3 (S.D.N.Y. Apr. 8, 2008) ("[T]he question of whether a plaintiff has stated a claim turns not on whether he has asked for the proper remedy but whether he is entitled to any remedy."); *Assured Guar. Mun. Corp. v. UBS Real Estate Sec., Inc.*, No. 12-cv-1579, 2012 WL 3525613, at *7 (S.D.N.Y. Aug. 15, 2012) ("It would be premature to strike a remedy at the pleadings stage.").

ING's motion to strike a demand for punitive damages would be premature even at the summary judgment stage let alone at the pleading stage; that determination is reserved for trial. *See Doe v. Montefiore Med. Ctr.*, No. 12 Civ. 686 (CM), 2012 WL 624688, at *7, (S.D.N.Y. Feb. 19, 2013); *Guoba v. Sportsman Props., Inc.*, No. 03-CV-5039 (JS)(WDW), 2006 WL 2792753, at *9, (E.D.N.Y. Sept. 26, 2006). ING's request to strike should therefore be denied.

---

[13] The Complaint also alleges extreme recklessness. ¶¶7–9, 12, 59, 82, 88–144.

New York law permits a plaintiff to recover the benefit of the bargain as damages under both breach of contract and breach of fiduciary duty. *See Kenford Co. v. County of Erie*, 537 N.E.2d 176, 180 (1989); *Trademark Research Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 332–34 (2d Cir. 1993). "The recovery of lost profits as damages for breach of contract is subject to the following requirements:

> First, it must be demonstrated with certainty that such damages are caused by the breach and, second, the alleged loss must be capable of proof with reasonable certainty. In other words, the damages may not be merely speculative, possible or imaginary, but must be reasonably certain and directly traceable to the breach, not remote or the result of other intervening causes. . . ."

*Coastal Aviation, Inc. v. Commander Aircraft Co.*, 937 F. Supp. 1051, 1064 (S.D.N.Y. 1996), *aff'd*, 108 F.3d 1369 (2d Cir. 1997); *see also Am. Fed. Group, Ltd. v. Rothenberg*, No. 91 Civ. 7860 (THK), 2003 WL 22349673, at *16 (S.D.N.Y. Oct. 14, 2003).

Here, Mashreq seeks the benefit of the bargain that they would have received– damages that are recoverable under both breach of contract and breach of fiduciary duty. ¶¶159, 168. These damages are directly traceable to the breach and capable of proof with reasonable certainty since ING publicly provides its performance results. ¶¶31, 146; Ex. 2. The question of whether they properly fall under the umbrella of contract, breach of fiduciary duty or fraud damages does not preclude a determination of whether Mashreq is entitled to relief and is premature in any event.

## VI.   Conclusion

For all the foregoing reasons, ING's motion to dismiss should be denied in its entirety. To the extent the Court identifies any deficiencies that can be cured by amendment, Mashreq respectfully requests leave to amend. *See* Fed. R. Civ. P. 15(a) (leave to amend should be freely granted when justice so requires); *Foman v. Davis*, 371 U.S. 178, 182 (1962).

DATED: July 2, 2013                    Respectfully submitted,

                                       THE MEHDI FIRM

                                            s/Azra Z. Mehdi

One Market
Spear Tower, Suite 3600
San Francisco, CA 94105
(415) 293-8039
———
347 5th Avenue, Suite 1402
New York, NY 10016

azram@themehdifirm.com

Attorney for Plaintiff